## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **KNIGHT & SON TRANSPORTATION, INC.,** | ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) ) ) |
| **VOLVO GROUP NORTH AMERICA, LLC d/b/a VOLVO TRUCKS NORTH AMERICA,** | ) ) ) ) ) |
| **Defendant.** | ) ) ) |

**CASE NO.: 1:17-CV-00006-CSC**

## VOLVO GROUP NORTH AMERICA, LLC'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Volvo Group North America, LLC d/b/a Volvo Trucks North America ("Volvo"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves the Court to enter a partial summary judgment in its favor and against plaintiff Knight & Son Transportation ("Plaintiff"), and as grounds therefore says as follows:

### I.    INTRODUCTION

This is primarily a breach of express warranty case.  In 2012, plaintiff, a trucking company, leased six (6) heavy trucks[1] manufactured by Volvo.  Plaintiff drove these trucks in its trucking business for roughly 4 1/2 years, until the end of

---

[1] These are Class 8 heavy trucks, the "tractor" component of what is commonly referred to as "tractor-trailer," or "eighteen wheeler."

2016.  During that time, plaintiff averaged in excess of 10,000 miles per month on each of the trucks.  Ten thousand miles is recognized as about the maximum a solo driver can drive per month under federal regulations, is also the stated mileage limit under the leases for the trucks, and plaintiff admitted his goal was to drive the trucks 10,000 miles per month.  Despite achieving 10,000 miles per month, at the end of 2016 plaintiff ceased operating the trucks, complaining of performance and reliability issues.  Plaintiff filed suit against Volvo on January 5, 2017.

Plaintiff alleges in Count One of its Complaint that certain components and systems on the trucks, particularly the emissions systems, were defective, and that Volvo breached its express warranties for the trucks by failing to adequately repair or replace the alleged defective components or systems.

In addition to its warranty claims, plaintiff alleges fraud and concealment claims arising out of plaintiff's lease of the trucks.  Plaintiff's Count Two alleges that Volvo misrepresented facts regarding the emissions systems of the trucks, the performance and reliability of the trucks, and promised fuel economy of the trucks, upon which Plaintiff relied in deciding to lease the trucks.  Plaintiff's Count Three alleges, as a mirror image of Count Two but in terms of concealment rather than misrepresentation, that in connection with plaintiff's lease of the trucks, Volvo fraudulently concealed from plaintiff the fact that the emissions systems on the trucks were defective and not reliable, that the emissions control system would

cause the trucks to repeatedly  break down, and that the trucks would not achieve the promised fuel economy, and that had plaintiff been aware of the true facts it would not have leased the trucks.

This motion is directed to plaintiff's fraud claims, and also to certain of plaintiff's damage claims.  Volvo is entitled to summary judgment on plaintiff's misrepresentation and concealment claims because (1) it is undisputed that Volvo had no communication or contact with plaintiff regarding the lease of the trucks, (2) Volvo is not liable for the representations of the Volvo dealer Action Truck Centers of Dothan, Inc., (3) the alleged misrepresentations are non-actionable puffery, or otherwise too general to sustain a claim for misrepresentation or concealment, and (4) the fraud claims are barred by the statute of limitations. Further, certain of plaintiff's damage claims fail as matter of law, particularly plaintiff's effort to seek lost profits damages for a second 5 year lease period following the initial leases of the six trucks, and for 2017 beyond plaintiff's costs to mitigate its damages.

## II.    STATEMENT OF THE FACTS

The facts, taken in a light most favorable to Plaintiff for summary judgment purposes, are:

A.    **OVERVIEW**

1.    Plaintiff is an interstate motor carrier located in Brundidge, Alabama, started by Paul Knight and his son Jeff Knight in 2005.[2]  Ex. 1 pp. 25, 50, 52. Plaintiff operates both company owned trucks and owner-operator trucks. [3]  From 2012-16, Knight operated about 24 trucks, of which about 13 would have been company trucks. *Id.* pp. 94-95.

---

[2] Prior to starting Knight and Son Transportation, both Paul and Jeff Knight had considerable experience in the trucking industry.  Paul Knight's father was an owner-operator trucker, and Paul began working on his father's trucks as early as age 13.  Ex. 1, pp. 11-13.  After high school, Paul worked for trucking companies, including Wiley Sanders Truck Lines, repairing and servicing trucks.  Id. at 10-12. In 1983, once Paul was old enough to became a commercial truck driver, he started driving for Wiley Sanders.  Id. at 17-20.  Except for a brief one-year stint as an owner-operator, Paul drove for Wiley Sanders until 1997.  In 1997, Paul left Wiley Sanders and drove as an owner-operator until 2005, when he started plaintiff with his son.  Id. at 24-25.  Additionally, in 1997 Paul started W.J. Knight Enterprises, a company that owned trucks which drove under contract with a trucking company called Great Wide Transportation.  Id. at 33-35.  After plaintiff was formed in 2005, W.J. Knight Enterprises leased trucks to plaintiff.  Id.

Similarly, Jeff Knight went to work after high school at Wiley Sanders, and put himself through college working there.  Ex. 1, pp. 25-26.  Jeff was not a truck driver, but worked in Wiley Sanders' offices, handling driver logs, fuel tax, and other issues.  Id.  By the time plaintiff leased the Volvo trucks at issue in the case, Paul and Jeff Knight had been operating plaintiff for 7 years.

[3] "Company trucks" are trucks leased or owned by plaintiff, and driven by employees of plaintiff.  "Owner-operator" trucks are owned by individuals who are not employees of Knight, but drive for Knight as independent contractors.  Ex. 1, pp. 53-56, 76-77.

2.      Prior to 2012, plaintiff had only acquired and operated used trucks, generally 4-5 years old, as its company trucks, and had never acquired or operated new trucks.  Ex. 1, pp. 69-70.

3.      In the spring of 2012, Paul and Jeff Knight began discussing among themselves the possibility of acquiring new trucks for their business.  Ex. 1, pp. 153-54.   Coincidentally, after Paul and Jeff Knight had been contemplating acquiring new trucks for about 2 months, Jeff Thomley, a salesman for Action Truck Centers of Dothan, Inc. ("Action"), made an unsolicited sales call on plaintiff at plaintiff's place of business in Brundidge to discuss the sale of new Volvo trucks to plaintiff.  *Id.* at 154.

4.      Action is an independent authorized Volvo dealer located in Dothan, Alabama.  Action's relationship with Volvo is governed by a written dealership agreement between Action and Volvo.  Ex. 2.

5.      Plaintiff leased 3 new Volvo trucks through Action in July 2012.  Ex. 3.  The trucks were Volvo model VN 760 sleeper cabs equipped with Volvo D13 engines, each with 455 hp, and Eaton transmissions.   Action had previously purchased the trucks from Volvo, and they were part of Action's inventory.  Action sold the trucks to GE Capital, which then leased the trucks to plaintiff.  The first three Volvos went into service at plaintiff in July 2012.  Ex. 4.

6.    At the time plaintiff leased the 3 new Volvos in July 2012, plaintiff planned to operate them for approximately 6 months, and, if pleased with them, to lease 3 more new Volvo trucks.  Ex. 1, pp. 181-83.  Plaintiff was in fact pleased with the performance of the first 3 Volvos, both as to reliability and fuel economy. *Id.*  Therefore, in December 2012, plaintiff leased 3 more Volvos.  *Id.*

7.    The second group of three (3) new Volvo trucks were leased to plaintiff by Volvo Financial Services ("VFS"), a separate entity from Volvo Trucks but a member of the Volvo corporate family.  Ex. 5.  These three trucks were also inventory trucks at Action, and were sold to VFS to be the Lessor because VFS had a better lease financing rate than GE Capital.  These new trucks included (1) a VNL 670 model equipped with a D13, 425 hp engine; (2) a VNL 680 model, a smaller model than the VNL 760, equipped with a D13 500 hp engine; and (3) a VNL 780 model, the largest model made by Volvo, equipped with a D13 500 hp engine.  Each of these trucks was also equipped with Volvo's I-shift transmission.  Plaintiff placed these trucks into service in mid-late December 2012.  Ex. 4.

8.    Plaintiff chose a 60 month (5 year) term for all 6 of the leases in order to get the lowest monthly payment.  Ex. 1, p. 180.  Knight made no down payment on the trucks.  All of the leases had a mileage limitation of 10,000 miles per month,

or 600,000 total miles, after which Knight would owe a penalty based on the number of excess miles. *Id.* at 180.

9.    Volvo gave its standard express warranty for each of the trucks, and plaintiff also purchased extended warranty coverage for each truck as well. Volvo's express warranties covered the chassis and the engine for a period of 12 months or 100,000 miles, whichever occurred first.   The extended warranties plaintiff purchased extended the engine coverage to 48 months or 500,000 miles, whichever occurred first.   Plaintiff also purchased an extended warranty on the emissions system, up to 48 months or 500,000 miles, whichever occurred first.  Ex. 1, pp. 172-73; Ex. 6.

10.    Plaintiff admits that Volvo only warranted each truck individually, and did not warrant them collectively as a group, or a fleet.  Ex. 1, p. 179.  Volvo gave express warranties only, and expressly disclaimed any implied warranties, including the implied warranties of Merchantability and Fitness for a Particular Purpose.  Ex. 6.

11.    Plaintiff admits that the first 3 trucks, placed into service in July 2012, performed well, thus leading to plaintiff's decision to lease the second group of 3 trucks.  Ex. 1, p. 181-83.  Plaintiff further admits that all of the trucks performed well, and met plaintiff's expectations, until around the spring of 2015.  *Id.* at 184-86.

12.    In late 2016, plaintiff ceased operating the Volvo trucks, complaining of reliability issues with the trucks during 2015 and 2016.  Ex. 1, p. 219, 221-22. Plaintiff replaced the Volvo trucks with 6 used Freightliner trucks which plaintiff leased.  Ex. 1, p. 235-39.  None of the used Freightliners were subject to US 2010 emissions regulations.[4]  By the end of 2016, plaintiff had completely replaced the Volvo trucks with the used Freightliners.  *Id.*  Aside from one Volvo which operated for the first 2 weeks of January 2017, plaintiff did not operate the Volvos in 2017.  Ex. 4.   Plaintiff was pleased with the performance of the used Freightliners through 2017 and into 2018.  Ex. 1, p. 240.

13.    The leases of the three Volvo trucks leased through GE Capital expired by their terms in July 2017.  Ex. 3.  After taking these three trucks out of service in 2016, plaintiff continued to make the lease payments to GE Capital through the end of the lease terms, and then returned the trucks to GE Capital pursuant to the terms of the leases.  Ex. 1, p. 211-12.  The Volvo Finance leases expired by their terms in December 2017.  Ex. 5.  Rather than continue making the lease payments on the trucks leased from Volvo Finance, plaintiff stopped making

_____

[4] Two of the Freightliners may have had US 2007 emissions engines.  Ex. 1, p. 237.  The remaining 4 were glider kits, meaning plaintiff acquired the chassis only, into which plaintiff installed older, pre-US 2007 emissions engines.  *Id.* at 38-39.  Plaintiff chose the older engines as plaintiff itself could perform any necessary repairs to the older technology engines.  *Id.*

the lease payments on those trucks, and returned them to Action in early 2017.  *Id.* at 221-22.

14.    Despite plaintiff's claims that the Volvo trucks were not reliable and failed to perform, it is undisputed that plaintiff averaged over 10,000 miles per month for each of the trucks.  Ex. 7, p. 48, Exs. 8-9.  Paul Knight admitted that under Federal Motor Carrier Safety Regulations, a solo driver can typically drive about 10,000 miles a month, perhaps slightly more depending on the routes and the loads.  Ex. 1, p. 77.  Plaintiff's goal was for its drivers to drive 10,000 miles per month, which is also consistent with the mileage allowances under the leases.  *Id.* at 341.  Each of the Volvo trucks exceeded this mileage goal.  And each of the Knight trucks was over the 10,000 mile per month mileage allowance under the leases, so that Knight would owe a mileage penalty at the end of the leases.

**B.    Volvo Had No Communication With Plaintiff Regarding The Lease Of The Trucks**

15.    All six of the Volvo trucks plaintiff leased were trucks Action purchased from Volvo.  Action determined the specifications for the trucks, including the model, engine and horsepower rating, transmission, and axle ratios.

16.    Volvo had no contact with plaintiff regarding the specification, order, or lease of the trucks to plaintiff.  Ex. 1, pp. 161-63.  Volvo had no contact or communication with plaintiff in connection with the lease of the trucks.  Id.   No one from Volvo ever visited plaintiff, or had any discussions or communications

with anyone from plaintiff, or made any representations to plaintiff, prior to or in connection with the lease of any of the Volvo trucks by plaintiff. *Id*, Ex. 11, pp. 123, 126-27.

**C.     The Lease of the First Three Volvo Trucks and Alleged Oral Representations by Thomley of Action**

17.     In the spring of 2012 Thomley made about three (3) visits to plaintiff in Brundidge.  Ex. 1, p. 167.  At each visit Thomley met with both Paul and Jeff Knight to discuss plaintiff's potential acquisition of new Volvo trucks. *Id.* Thomley provided Jeff and Paul Knight brochures on the Volvo trucks, and a Volvo CD containing a video about the trucks. *Id.* at 168.  Thomley also brought a new Volvo truck to plaintiff for Paul and Jeff Knight to inspect and test drive. *Id.* at 347.

18.     As a salesman for an independent Volvo authorized dealer, Thomley attended annual classes at Volvo in Dublin, Virginia regarding Volvo sales and Volvo products.  Ex. 12, p. 28-29.  Thomley attended classes at Volvo on Volvo's US 2010 emissions product. *Id.*  Thomley was aware of many other customers of Action who had bought and operated Volvo trucks equipped with US 2010 emissions Volvo engines who operated their trucks without any significant issues with the emissions systems. *Id.* at 63-68.

19.     In his visits to plaintiff, Thomley discussed with Paul and Jeff Knight the qualities and features of the Volvo trucks.  According to Paul and Jeff Knight,

Thomley represented to them that (1) the Volvos were good, reliable and dependable trucks, (2) that the trucks got good fuel economy, (3) that Volvo's emission control system was ahead of the competition and had been tested in Europe, and (4) that Volvo would stand behind its warranty on the trucks.  Ex. 1, pp. 153-54, 163-64, 170-72, 346-47, 349-50.

20.    Regarding Thomley's representations about reliability of the Volvo trucks, Paul Knight testified:

> Q.    And then what else do you recall Mr. Thomley telling you about the reliability of the truck?  You said he told you that they were reliable, dependable trucks; is there anything else?
>
> A.    Not that I can remember.

Ex. 1, pp. 171-72.

21.    Regarding fuel economy, Thomley told Paul and Jeff Knight that the Volvo trucks got good fuel economy, and that Thomley had a customer, Benny Whitehead in Eufaula, Alabama, averaging 8 miles per gallon, who the Knights could call about fuel economy.  Ex. 1, pp. 155-57.

22.    Regarding Thomley's representations about the emissions systems on the trucks, Paul Knight testified:

> Q.    (By Mr. Waller)  Tell us please, sir, whether you had specific discussions with Mr. Thomley, not only about the general reliability of the trucks, but this new emissions system?
>
> A.    Yes, I did.
>
> Q.    What did he tell you about that?

A.     He said that Volvo had been testing it overseas, and that they were way ahead of the competitors, that their trucks were more reliable, and if we had problems, that Volvo would fix it in a timely manner.

Q.     And did he tell you anything about dependability, in terms of maintenance, low maintenance?

A.     Very low maintenance.

Q.     What did he tell you in that regard?

A.     He said that they were so far ahead of their competitors that their DEF systems, emissions systems, required less maintenance than any other manufacturer.

Q.     Well, did he tell you specifically that the Volvo emissions control system was ahead of competitors and a better system?

A.     Yes, and he had documents from Volvo stating to that.

Ex. 1, pp. 349-50.

23.     Finally, regarding Volvo's warranty, Paul Knight testified:

Q.     (By Mr. Waller)   Did you have any discussions with Mr. Thomley about what would happen if one of the trucks turned out to be a lemon?

A.     Jeff [Knight] pointblank asked him, if we get a lemon, what will be done about it, and he told both of us, as we were walking out to test drive the truck, that he had a case right now that he was working on to get the man out of the truck.

Ex. 1, pp. 346-47.

## D.     Alleged Representations in Volvo Marketing Materials

24.     Plaintiff no longer possesses the Volvo brochures and CD which Paul

Knight testified Action salesman Thomley provided during his sales calls.  Ex. 1,

pp. 168, 351-52.  Jeff Knight recalls Thomley showing them Volvo brochures, but does not recall that Thomley left any brochures with the Knights.  Ex. 11, p. 69. Thomley also no longer has the brochures or CD.  However, in discovery Volvo produced brochures which Paul Knight testified that, although he is not sure, appeared to be similar to the brochures Thomley provided.  Ex. 1, p. 169.  One brochure, which addresses Volvo's VNL630 and VNL670 models, touts the truck's reliability with statements such as "Dependability You Can Rely On," "We build our trucks to last," "Uptime is everything in this business," and "reliability coupled with our support network to maximize uptime all the time."  Ex. 13, pp. 3, 16-17.  The brochure further states that Volvo trucks are "backed with one of the best warranties in the business."  *Id.* at 17.

25.    Regarding fuel efficiency, the brochure states that "Fuel Efficiency Starts With The Driver," and addresses the features of the truck which allow drivers to achieve maximum fuel efficiency, such as the driver information system, aerodynamics, chassis fairings, and Volvo's SCR engine and I-shift transmission. Ex. 13, pp. 6-11.  The brochure further states "in our Dublin, VA assembly plant, we pair our latest generation of SCR engines with the exclusive Volvo I-shift transmission and XE fuel efficiency package.  Together they squeeze every last mile out of a gallon of diesel."  *Id. at* 11.

26.     However, the brochure does not state actual expected or projected fuel economy or miles per gallon for the truck or the engine.  Ex. 13.  Volvo does not publish or provide mile per gallon information, as actual fuel economy depends upon many factors, including e.g., the type of operation for the truck, the driver, the geographic area of operation, speed, and the specifications for the engine, transmission, and drive axles.  Ex. 14, p. 64.

27.     Although plaintiff and Thomley no longer have any of the brochures that Thomley may have provided on the engine and emissions system for the trucks, Volvo has also produced its brochures for the D13 engine.  It is not known whether these brochures were ever given to Paul or Jeff Knight.  Ex. 1, p. 168. One Volvo brochure for the D13 engine speaks of both performance and fuel efficiency: "Power and fuel efficiency.  The best of both worlds."  Ex. 15, p. 1. Regarding fuel efficiency, the brochure states the D13 "Can deliver 5% better fuel efficiency," referencing a footnote that states "Testing shows that under everyday driving conditions, this new generation of Volvo engines can deliver 5% better fuel economy than our highly efficient EPA engines."  *Id.* at 2.  The brochure further states regarding fuel efficiency: "Fact: Volvo D13 engine for EPA 2010 and beyond delivers the best fuel economy of any 13-liter coach engine out there.  It's ready to work with our innovative I-shift transmission and 1-VEB engine brake. And its ready to help drive operational savings right to your bottom line.  Which is

exactly what you'd expect from one of the world's leading manufacturers of heavy duty diesel engines." *Id.*

28.     Another Volvo brochure for the D13 engine provides regarding fuel economy that "It is critical to specify the truck properly to achieve maximum fuel economy and performance," and "2010 engines have been designed to achieve a maximum fuel economy by cruising at low engine rpm.   In D13 line haul specifications, the target is 1375 rpm at 65 mph."  Ex. 16, p. 2.   The brochure further advises the importance of specifying the proper rear axle ratios for the planned cruise engine speed to achieve the best fuel economy:

> For example, with 80k lbs GCW, 1650 lbs *ft torque, 295/75R 22.5 drive tires and 0.74 top gear ratio, the 3.36:l axle ratio would come closest to the 1375 rpm at 65 mph recommendation.  With 0.78 ratio transmission, you should use at 3.2.1:1 ratio for the same rpm at 65 mph.

> Never specify an EPA 10 Volvo engine for a cruise speed above 1600 rpm.

*Id.* at 2.

## E.     Plaintiff's Decision to Lease the Volvo Trucks

29.     Before making their decision to acquire new Volvo trucks, Paul Knight talked to an employee he personally knew at the Wiley Sanders trucking company about their experience with trucks operating under the US 2010 emissions standards.   Ex. 1, p. 165.   Notably, Wiley Sanders was operating Kenworth trucks, which were not equipped with Volvo engines.   The Wiley

Sanders employee responded that the trucks were doing fine, getting great fuel mileage with no issues. *Id.* at 165-66.   However, neither Paul or Jeff Knight contacted Benny Whitehead of Eufaula to confirm Thomley's statement that Whitehead was achieving 8 miles to the gallon on his Volvo trucks, or to discuss Whitehead's satisfaction with the Volvo trucks. *Id.* at 156.   Other than the Wiley Sanders employee, neither Paul or Jeff Knight talked with any other trucking companies about their experience with US 2010 emissions trucks before deciding to lease the Volvos. *Id.* at 164.

30.   Prior to deciding to lease the Volvo trucks, Jeff and Paul Knight discussed among themselves the feasibility of acquiring, for the first time in the history of their business, new trucks.   Ex. 1, p. 154.   New trucks, at a cost of approximately $130,000 each, would be considerably more expensive than five year old used trucks.   However, Paul and Jeff Knight did not develop a written or formal business plan for purposes of determining whether the increased cost of new trucks, rather than used, would work with their business model.   Ex. 1, p. 159. Instead, they informally considered whether anticipated fuel and maintenance savings from operating new trucks would cover the increase in the monthly lease payments of leasing new versus used trucks. *Id.* at 155-59.   The Knights did not preserve any notes or other documentation of this cost analysis. *Id.* at 155.   Paul Knight testified that Thomley had informed them that Benny Whitehead was

achieving 8 miles per gallon running Volvo trucks with 2010 US emissions at 62 miles per hour.  *Id.* at 157-58.  The Knights planned to run their trucks at 68 miles per hour.  So, according to Paul Knight, he and Jeff Knight, and also Jeff Thomley, determined that at 68 miles per hour, they should assume fuel economy of 6.8 to 7 miles per gallon.  *Id.*  Using that estimated fuel economy, Paul and Jeff Knight, without Thomley, then determined that at 6.8 miles per gallon, as compared with roughly 5.5 miles per gallon on their used trucks, the savings from fuel economy alone would more than offset the increased costs of leasing new trucks instead of used trucks.  *Id.* at 158-60.  This process took all of five minutes, according to Paul Knight:

> Q.   (By Mr. Morrow)  And you said that at some point you and Jeff [Knight] sat down, and I wrote down and figured up the fuel mileage and cost savings?
>
> A.   Yes.
>
> Q.   Did y'all make any notes of that or –
>
> A.   No.  We just scribbled it out on a piece of paper, you know, using the calculator and figuring.  Don't take five minutes to figure it out.

Ex. 1, p. 155.

31.    Because they expected to cover the increased monthly lease costs of the new trucks from fuel savings, and because the new trucks were under warranty, and should have less down time and loss repair costs than used trucks, and because

new trucks would help plaintiff retain and recruit drivers, Paul and Jeff Knight decided to lease 3 new Volvo trucks.  Ex. 1, pp. 153-54.

**F.**     **Plaintiff's Trucks Were Not Specified For Fuel Economy**

32.    The fuel economy which a truck can achieve is dependent upon many factors, including the type of operation to which the truck is put, the abilities and driving habits of the driver, and whether the various components of the truck are specified in order to maximize fuel economy. Ex. 14, pp. 298-300, 309-13.

33.    The 6 Volvo trucks plaintiff leased were specified for performance, not for fuel economy.  Ex. 14, pp. 297-300, 309-10.  This means the trucks had better acceleration and responsiveness, at the expense of fuel economy.  *Id.*  All of the trucks were specified with a rear axle ratio of around 3.25 and 3.36, which is a performance ratio, compared with a 2.46 ratio, which would give better fuel economy.  *Id.*  Only three (3) of the trucks, the second group of three delivered in December 2012, were specified with Volvo's I-shift transmission, which is recommended for better fuel economy.   *Id.* at 306-07, 311-13.  The I-shift is essentially an automatic transmission that shifts the gears in the most optimal manner to achieve the best fuel economy.  *Id.*  Thus the I-shift removes individual driver experience or habits that can adversely affect fuel economy.

34.    The maximum cruising speed of the truck is set by the owner depending upon his particular desires and operation.  Ex. 14, pp. 300-07.  In this

case, plaintiff set a cruising speed of 68-70 mph. *Id.*  A cruising speed of 62 mph is most fuel efficient.

35.    Additionally, an inspection of the plaintiff's trucks following the filing of the suit revealed that each of the trucks had engine idle time that exceeded fifty (50) percent of the engine's total operating time.  Ex. 14, pp. 120-21, Ex. 8. Thus for each of plaintiff's trucks, the engine was idling more than 50% of the time that the engine was in use.  Total idle time exceeding 50% is very excessive, as Volvo considers trucks with idle times over 30% to be engaged in heavy or severe duty, as opposed to normal duty, operation.  Ex. 14, pp. 118-19.  The excessive idle time of the plaintiff's trucks adversely effected their fuel economy. *Id.* at 122-23.

## G.    EPA Emissions Regulations And Emissions Technology

36.    The Environmental Protection Agency ("EPA") mandated severe reductions in diesel emissions in 2007 and in 2010.  The primary focus of emissions control is the reduction of diesel particulate, or soot, and oxides of nitrogen, "NOX."  The 2007 standards reduced diesel particulate emissions by 99%, and NOX emissions by 92%, from untracked 1974 levels.  The 2010 standards further reduced NOX emissions by 83% from 2007 levels, representing a 99% reduction from 1974 levels. *See* Ex. 7, pp. 10-11.

<u>US 2007: EGR and DPF</u>

37.     Generally, Volvo's US 2007 emissions technology consisted of the use of Exhaust Gas Recirculation ("EGR") and a Diesel Particulate Filter ("DPF"). Ex. 7, pp. 10-12.  In this system, some engine exhaust gasses were sent to an EGR cooler attached to the engine, where the gasses could be cooled, and then recirculated into the engine to be used in combustion, reducing NOX emissions. *Id.*  Exhaust gasses were also directed through a DPF, which trapped diesel particulate, reducing particulate emissions.  *Id.* at 52-54.  Periodically, the DPF had to be cleaned through a process called "regeneration," commonly referred to with the shorthand term "regen."  *Id.*   In regeneration, an additional fuel injector, referred to as the After-treatment Hydrocarbon Injector, or "AHI," would inject diesel fuel into the DPF chamber, where the fuel would be burned, which in turn oxidized, or burned, the diesel particulate in the DPF from soot to ash.  *Id.* at 53-56.  The ash accumulated at the bottom of the DPF chamber, and was periodically removed as a maintenance item.  *Id.* at 54.   Regeneration was performed "actively," meaning the driver initiated regeneration through controls on the truck's dashboard.  *Id.* at 56.

<u>US 2010: SCR</u>

38.     To meet US 2010 standards, Volvo, and most other OEM heavy diesel engine manufactures, added a technology called Selective Catalytic Reduction, or

"SCR." Ex. 7, p. 59. Prior to 2010, Volvo had successfully used SCR in Europe to meet European emissions regulations. Ex. 17, pp. 26-27. In SCR, after exhaust gasses leave the DPF, a urea based fluid, known as Diesel Exhaust Fluid, or "DEF," is injected into the exhaust. Ex. 7, pp. 92-95. The exhaust gasses and DEF enter a catalytic converter, called the SCR chamber, where in a chemical reaction with the DPF the NOX is converted into harmless nitrogen and water vapor, which are ultimately discharged into the atmosphere. *Id.*

39.     For normal operation, Volvo US 2010 emissions technology uses "Passive Regeneration" to oxidize soot in the DPF, as opposed to active regeneration. Ex. 7, pp. 55-56; Ex. 18, p. 1. Passive regeneration occurs automatically while the vehicle is being driven under load, when exhaust temperatures are sufficiently high from operation to burn and oxidize the soot into ash. *Id.* Passive regeneration is more fuel efficient, as it does not require the injection of fuel from the AHI. *Id.* Passive regeneration does not affect the operation of the truck as far as the driver is concerned. *Id.* While the Volvo US 2010 technology relied primarily on passive regeneration for normal operation, drivers could also perform active regenerations when necessary using controls on the truck's dashboard. *Id.* Whether a truck may need active regens in addition to passive regens depends on the truck's duty cycle, which could take it out of normal operation parameters. Ex. 17, pp. 65-66.

40.   The addition of SCR technology in 2010 also allowed Volvo to make its engines more fuel efficient than its US 2007 EGR only engines.  Ex. 19, Bates 1604.  NOX production is directly related to efficient engine combustion.  The more efficient the engine, the more NOX that is produced.  In order to meet 2007 NOX emissions standards, the 2007 engines had to be tuned to combust less efficiently to reduce NOX.  *Id.*  However, with the addition of SCR in 2010 to reduce NOX omissions, the 2010 engines could be retuned to combust more efficiently, since the excess NOX produced was eliminated through SCR.  *Id.*  Because Volvo's US 2010 engines are tuned for more efficient combustion, they are more fuel efficient than Volvo's US 2007 engines.

## H.   Facts Regarding Certain of Plaintiff's Damage Claims

Plaintiff disclosed an accountant, Robert H. Gould, as an expert for calculation of plaintiff's claimed lost profits damages.  Ex. 20, p. 3.  The key to Gould's methodology for calculating lost profits is an assumed gross revenue figure of $900 per operational day per truck.  Ex. 21, pp. 53-54, 58-62.  Gould's basis for using $900 as a gross revenue per day figure was that Paul Knight told him plaintiff's goal was to earn $900 per day per truck in gross revenue, and also that according to Gould's calculations the Volvo trucks met the $900 gross revenue goal in the years 2013 and 2014.  *Id.* at 53-54, 60-65, 87-88.  Gould then assumed each truck would operate a total of 245 days per year, after accounting for

weekends and holidays. *Id.* at 59. Thus according to Gould each of plaintiff's trucks should earn gross revenues of $220,500 ($900 x. 245 days) per year. *Id.* Gould then subtracted the actual gross revenue earned by the Volvos in the years 2014 and 2015 from the $220,500 annual gross revenue goal. The difference according to Gould is the gross revenue loss due to the performance of the Volvos. *Id.* at 53-54. Gould then deducted certain expenses from his lost gross revenue figure to arrive at a claimed lost net revenue, or lost profits, figure, for the years 2015 and 2016. *Id.*

In 2017, however, plaintiff did not operate the Volvo trucks, but instead had replaced them with the 6 used Freightliners. Ex. 21, pp. 130-32, 135-37. To calculate lost profits for 2017, Gould used the same methodology that he did for 2015 and 2016, that is comparing actual gross revenue to the $220,500 per year gross revenue goal. *Id.* at 133-34. However, lacking revenue figures for the Volvo trucks as they did not operate in 2017, Gould simply used the revenues earned by the Freightliners, and calculated, pursuant to his methodology, a lost net revenue figure for the Freightliners in 2017. *Id.* at 132.-33. Gould then treated the calculated lost revenue from the Freightliners as if it were in fact lost revenue from the six Volvo trucks at issue, and includes that figure as damages claimed to have resulted from operation of the Volvo trucks. *Id.* at 136-39.

41.     Further, Gould extended his lost profits calculation to the years 2018-2022, a five year period following the end of the leases for the Volvo trucks, all of which expired by their terms by the end of 2017.  Ex. 21, p. 155.  Gould testified that he interviewed Paul Knight, who informed Gould that his plan and intention at the end of the leases of the six Volvo trucks was to lease six more new Volvo trucks.   Based solely on Knight's stated plan, Gould extrapolated his lost net revenue calculation five years into the future, from 2018-2022, representing the future 5 year leases of six more trucks Knight claimed that he planned to enter into. *Id.* at 153-55.  Gould admitted in his deposition that he had no basis for carrying his damage calculations five years beyond the terms of the existing leases other than Knight's stated plan.   *Id.*   Further, Gould admitted in his deposition that plaintiff was under no obligation to lease any Volvo trucks after the expiration of the original leases, and that following the end of the original leases plaintiff was free to lease trucks from any heavy truck maker, not just Volvo, or not to lease any new trucks at all.  *Id.* at 155-57.

**I.      Repairs to the Volvo Trucks and "Derate"**

42.     Attached as Exhibits 22-28 are spreadsheets listing all warranty claims and warranty work performed by Volvo dealers on each of the subject Volvo trucks.  The information on the spreadsheets comes from Volvo's warranty claim information and matches the information provided in the individual Volvo

warranty claim documents produced to plaintiff in this case.  Upon completion of each warranty repair, when the driver picked up the truck from the Volvo dealer, the dealer would provide the driver a repair invoice which detailed the nature of the problem and the repairs performed.  A sample of 3 repair orders from Action for the subject Volvos is attached as Ex. 29.  Generally, the description of the issue and work performed matches the descriptions entered into Volvo's warranty system and stated in Exs. 22-28.

43.   "Derate" is a condition required by the EPA's US 2010 emissions regulations.  Ex. 7, pp. 54-55.  The regulations require that a truck monitor its emissions output to ensure compliance with the regulations.  *Id.*  If there is an issue with a truck such that it is not operating in compliance, the driver receives a warning that the truck needs to be taken in for service, or the truck could go into "derate."  *Id.*  Derate is a staged process that over time will begin to gradually decrease the power output of the engine to various levels, including for example a maximum speed of 50 mph, and, if the problem remains unresolved, ultimately 5 mph.  *Id.* at 54-55, 105-06.  This EPA requirement prevents drivers from continuing to drive for extended periods while ignoring dashboard messages that the emissions are not in compliance with EPA mandates.  *Id.*

## III.   SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).1  Only disputes about material facts will preclude the granting of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir.1996) (quoting *Anderson*, 477 U.S. at 248).

Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material

fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[ ], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R .Civ. P. 56(c)(1)(A) & (B).

If the nonmovant "fails to properly address another party's assertion of fact" as required by Rule 56(c), then the Court may "consider the fact undisputed for

purposes of the motion" and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2) & (3).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant.  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir.2003).  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor.  *Anderson*, 477 U.S. at 255.  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir.2005) (per curiam). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

The following facts, even when viewed in the light most favorable to plaintiff, demonstrate that summary judgment is warranted in this case.

## IV.   ARGUMENT

**A.**   **Plaintiff offers no evidence to establish that anyone communicated as Volvo's agent.**

Plaintiff does not claim to have ever communicated directly with Volvo. Thus, the alleged misrepresentations by Thomley in his capacity as a salesperson for Action cannot implicate Volvo unless Thomley acted as Volvo's agent.   *See McLemore v. Ford Motor Company*, 628 So. 2d 548, 551 (Ala. 1990)(holding that auto dealer's communications could not bind auto manufacturer in absence of proof of agency relationship).   Whether an express agency relationship exists depends on whether there is evidence of a retained right of control by the principal over the agent.   *Id.* (citing *John R. Cowley & Bros., Inc. v. Brown*, 569 So. 2d 375, 381 (Ala. 1990)).   An agency relationship may not be presumed.   *Battles v. Ford Motor Credit Co.*, 597 So. 2d 688, 689 (Ala. 1992).

Plaintiff offers no evidence that Volvo retained any right of control over Thomley or Action.   At best, plaintiff can point to Thomley handing out Volvo's brochures and having attended Volvo's training class on trucks.   But both are perfectly consistent with Action being an independent retail dealer of Volvo trucks. Neither establish any right of Volvo to control Action's communications, and neither contradict the written agreement between Volvo and Action establishing an independent dealer relationship.   The Dealer Agreement between Volvo and Action makes clear Action is an independent contractor and not an agent of Volvo:

1.1    Relationship Between Company and Dealer

The Dealer is an independent contractor, not the agent of the Company.   The Dealer therefore has no authority to bind the Company to a third party.

The Dealer also is solely responsible for its own acts and omissions.

Ex. 2, Bates Volvo 001494.

Nor does plaintiff offer evidence establishing Thomley's apparent authority to speak on behalf of Volvo.  "The doctrine of apparent authority is based upon the actions of the principal, not those of the agent; it is based upon the principal's holding the agent out to a third party as having the authority upon which he acts, not upon what one thinks an agent's authority might be or what the agent holds out his authority to be."  *Malmberg v. American Honda Motor Co., Inc.*, 644 So. 2d 888, 891 (Ala. 1994).

Plaintiff offers no evidence that Volvo held out Action or Thomley as Volvo's agent.  Plaintiff had no contact or communication with anyone from Volvo regarding the lease of any of the Volvo trucks.   The fact that Action had permission to use Volvo's logo, branding, literature, brochures and the like, and to sell Volvo's products, do not create an inference of agency.  *See id.*   There is nothing else that Volvo did to cloak Thomley with apparent authority to speak on behalf of Volvo.  Accordingly, since plaintiff can offer no evidence sufficient to create a factual dispute concerning Thomley's express or apparent agency, Volvo

is due summary judgment in its favor on all claims of misrepresentation or suppression based on Thomley's communications.

**B.** **Plaintiff could not rely upon puffery as a matter of law.**

Sales puffery and opinions do not constitute actionable fraud. "[S]tatements of opinion amounting to nothing more than 'puffery' or predictions as to events to occur in the future are not statements concerning material facts upon which individuals have a right to act and, therefore, will not support a fraud claim." *Fincher v. Robinson Bros. Lincoln-Mercury, Inc.*, 583 So. 2d 256, 259 (Ala. 1991); *accord McGowan v. Chrysler Corp.*, 631 So. 2d 842, 846-847 (Ala. 1993)(holding car salesman's statements that car was "top of the line" and "smooth riding" were puffery and not statements of material fact); *Fincher*, 583 So. 2d at 256 (finding statements by salesman that car was a "fine car" that "would be dependable and reliable and that it would give [plaintiff] good service" were "nothing more than 'puffery'"); *Lucky Manufacturing Co. v. Activation, Inc.*, 406 So. 2d 900, 905 (Ala. 1981) (finding sales representative's statement that "the Webster pump was 'as good or better' than a Commercial Shearing pump" was "trader's talk" or "puffery" that could not support a fraud claim).

Plaintiff's fraud claims likewise rest on non-actionable sales puffery. Concerning the trucks' reliability and performance, plaintiff complains of statements by Thomley that the trucks were "way ahead of the competitors, that

their trucks were more reliable;" and that the trucks were "very low maintenance." Plaintiff also complains that product brochures stated things like "Dependability You Can Rely On," "We build our trucks to last," "Uptime is everything in this business," and "reliability coupled with our support network to maximize uptime all the time." Such statements of opinion are nothing more than sales puffery that will not support a fraud claim.

Concerning fuel economy, plaintiff complains that Thomley represented that "Volvo trucks got good fuel economy." Plaintiff also complains that the product brochure stated things like "in our Dublin, VA assembly plant, we pair our latest generation of SCR engines with the exclusive Volvo I-shift transmission and XE fuel efficiency package. Together they squeeze every last mile out of a gallon of diesel;" and "Fact: Volvo D13 engine for EPA 2010 and beyond delivers the best fuel economy of any 13-liter coach engine out there. It's ready to work with our innovative I-shift transmission and 1-VEB engine brake. And it's ready to help drive operational savings right to your bottom line." Again, such statements of opinion are nothing more than sales puffery that will not support a fraud claim.

Concerning the trucks' emissions system, plaintiff complains that Thomley said "that they were so far ahead of their competitors that their DEF systems, emissions systems, required less maintenance than any other manufacturer."

Plaintiff also complains that the product brochures made the same claim.  But these statements of opinion are sales puffery that will not support a fraud claim.

Plaintiff also complains that Thomley misrepresented that Volvo would fix the trucks if problems occurred: "He said that . . . if we had problems, that Volvo would fix it in a timely manner."  Plaintiff also points to the brochure's claim that Volvo trucks are "backed with one of the best warranties in the business."  But these are statements of opinion or future predictions that are sales puffery.  Such statements cannot support a fraud claim.

In summary, Plaintiff's complaints about alleged misrepresentations concerning the trucks' dependability and reliability, comparisons with competitors, fuel efficiency, and maintenance and warranty service are sales puffery that cannot constitute fraud as a matter of law.  Volvo is due summary judgment in its favor on all such claims.

## C.  To the extent any alleged misrepresentations are not considered sales puffery, they are still too general and vague to constitute fraud.

Representations must be reasonably certain and definite to be actionable as fraud.  *Kaye v. Pawnee Const. Co.*, 680 F.2d 1360, 1367 (11th Cir. 1982) (applying Alabama law); *Campisi v. Scoles Cadillac, Inc.*, 611 So. 2d 296, 300 (Ala. 1992) ("general statements" are "not representations sufficient to sustain a fraud claim"); *Ellis v. City of Birmingham*, 576 So. 2d 156, 157 (Ala. 1991) (plaintiff's reliance on defendants' statements unreasonable where statements were uncertain and

vague).   Alabama in this regard follows well established and commonly held principles of the law of fraud:   "The representation must contain the essential elements of fraud, and it must be unqualified, definite, and specific.   Mere vague, general, or indefinite statements are insufficient, because they should ordinarily put the hearer on inquiry, and there is no right to rely on such statements."   37 C.J.S. Fraud § 19 (Thomson Reuters 2018)(citations omitted).

The Supreme Court of Alabama applied these principles in *Hanson v. New Technologies, Inc.*, 594 So.2d 96 (Ala. 1992).   After plaintiff had been summarily terminated, he sued for fraud, claiming that he had relied upon his employer's misrepresentation in an employee handbook that "Disciplinary actions are administered in an objective, constructive manner . . . ."   *Id.* at 102.   The court concluded that the quoted provision "is a vague, general statement" that was "not a representation sufficient to sustain a fraud claim."   *Id.*

Likewise here, any statements pointed to by Plaintiff, even if not considered sales puffery, are still too vague and general to sustain a fraud claim.   Plaintiff does not allege that representations were made concerning a specific truck, with a specific configuration or specification that plaintiff was purchasing, for the particular operating parameters, conditions, and circumstances that Plaintiff's trucks would encounter.   Indeed, plaintiff purchased different trucks with different specifications, used the trucks atypically with excessive idle times, and targeted an

average speed higher than that optimized for fuel economy, just to name a few specific circumstances material to the performance of these trucks.  There is no evidence that Action salesman Thomley was aware of the specifics of plaintiff's operation, in particular plaintiff's excessive idle times which adversely affect fuel economy.  Further, certainly Volvo had no knowledge of plaintiff's operations, as Volvo did not have any contact with plaintiff regarding the lease of the trucks.  The alleged pre-sale representations about Volvo trucks in general, without reference to any particular specifications or operating conditions, were not sufficiently certain and definite to constitute fraud.

Regarding fuel efficiency, for example, the brochure states the D13 engine "[c]an deliver 5% better fuel efficiency," referencing a footnote that states "Testing shows that under everyday driving conditions, this new generation of Volvo engines can deliver 5% better fuel economy than our highly efficient EPA engines."  This statement is a comparison of Volvo's US 2007 emission engines to Volvo's US 2010 engines.  The statement says nothing about what the "everyday driving conditions" were, what fuel economy the trucks with "highly efficient EPA engines" achieved during testing, what fuel economy the trucks with new D13 engines achieved during testing, the specifications and equipment on the tested trucks, or how and under what conditions the referenced tests had been administered.  Nor does the statement say what actual fuel economy a particular

customer may expect, as that is dependent upon too many variables, including how the trucks were specified, *i.e.,* for fuel economy or performance, the nature of the customer's operation, geography, and particularly in this case, engine idle time. For these reasons Volvo does not publish expected miles per gallon figures for its engines or trucks.  So the brochure's claim about "5% better fuel efficiency" of D13 engines is not sufficiently specific and definite to support a fraud claim related to the performance of Plaintiff's specific trucks under Plaintiff's specific operating conditions and circumstances.

The same is true of Plaintiff's attempt to morph into fraud Thomley's alleged representations about the fuel economy experienced by his other customers, namely Benny Whitehead.   What were the involved trucks' specifications?  How were they being driven and operated?  What weights were they hauling?  So any representations by Thomley about fuel economy experienced by other customers, without more, were not sufficiently specific and definite to support a fraud claim.  Further, plaintiff admitted that it did not attempt to contact Benny Whitehead regarding his experience with Volvo trucks and engines.

In short, to the extent Plaintiff's fraud claims rest upon any alleged representations that are not sales puffery, such representations are too vague, uncertain and general to constitute fraud.  This is yet another ground that Volvo is due summary judgment in its favor on Plaintiff's fraud claims.

**D.**   **Plaintiff offers no competent proof that alleged misrepresentations were false.**

To constitute fraud, a representation must be false.  Ala. Code § 6-5-101 (1975); *International Resorts, Inc. v. Lambert*, 350 So. 2d 391, 394 (Ala. 1977).  But plaintiff offers no proof that the representations complained of were false when made.  Plaintiff offers no proof, for example, that Volvo did not do the referenced testing, that any test results were other than as represented, that the experiences of Thomley's other customers had been other than as represented, or that any other representations in Volvo's brochures or by Thomley were false when made.  Accordingly, Volvo is due summary judgment in its favor on the Plaintiff's claims of fraud.

**E.**   **Plaintiff relied on actual experience, not presale representations, when leasing the last three trucks.**

Plaintiff cannot predicate a claim of fraud on any misrepresentation it never relied upon.  *See Boswell v. Liberty Nat'l Life Ins. Co.*, 643 So. 2d 580, 581 (Ala. 1994).   Moreover, to the extent plaintiff alleges to have relied on a misrepresentation, that reliance must have been reasonable.  *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 422 (Ala. 1997).  "[I]f the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the [Plaintiff] should not recover."  *Torres v. State Farm Fire & Cas. Co.*, 438 So. 2d 757, 758-59 (Ala. 1983).  "[T]he right of reliance comes with a

concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests." *Id.* at 759 (Ala. 1983). Thus, Alabama courts have often rejected fraud claims as a matter of law where plaintiff's reliance was simply not "reasonable under the circumstances." *Torres*, 438 So. 2d at 759; *see also Wilma Corp. v. Fleming Foods, Inc.*, 613 So. 2d 359, 366 (Ala. 1993)(overruled on other grounds by *Bruce v. Cole*, 854 So. 2d 47 (Ala. 2003)); *Gardner v. State Farm Mut. Auto. Ins. Co.*, 822 So. 2d 1201, 1209 (Ala. Civ. App.), *aff'd*, 822 So. 2d 1211 (Ala. 2001).

By the Knights own admissions, they decided to purchase the last three trucks based upon satisfactory performance of the first three. So they chose not to rely upon pre-sale representations to purchase all six trucks. Moreover, when they purchased the last three, they knew from experience how the first three trucks' performance compared with any pre-sale representations. If, as plaintiff claims, the first three trucks did not live up to pre-sale representations, then plaintiff certainly could not have reasonably relied upon those same pre-sale representations when purchasing the next three trucks. Volvo is therefore due summary judgment in its favor on any fraud claims arising from the purchase of the last three trucks.

**F.**   **Plaintiff could not reasonably rely on presale representations concerning performance that did not pertain to Plaintiff's own truck specifications and performance parameters.**

As stated above, Alabama law does not allow a plaintiff to recover for detrimental reliance that was unreasonable, and plaintiff's purported reliance on the alleged pre-sale representations by Thomley and in the Volvo brochures was patently unreasonable.   Plaintiff complains that the purchased trucks did not achieve fuel economy as represented.   But the very brochures that plaintiff allegedly relied upon reference the importance to fuel economy of the Volvo I-shift transmission, XE fuel efficiency package, target speeds and rpm's, axle ratios, and other specifications and operating parameters.   (Of course, as experienced truckers who had operated a trucking business for years, the Knight brothers did not need any brochures to understand this.)   Yet plaintiff never inquired whether and how different specifications in the trucks actually being purchased would affect fuel economy.   Nor did plaintiff ask how its own higher target speeds and rpm's would affect fuel economy.   Nor did plaintiff ask how its own trucks' higher than normal idle times would affect fuel economy.   Nor did plaintiff bother to call Thomley's other customers to confirm their fuel economy and how they achieved it—with what specifications and operating parameters and conditions.   Thus, plaintiff did not reasonably rely upon pre-sale representations about fuel economy that was not specific to their particular trucks' individual specifications, configurations and

anticipated operating parameters, and Volvo is due summary judgment in its favor on claims of fraud related to fuel economy.

The same is true of plaintiff's fraud claims arising from alleged representations about the performance of Volvo emission systems. Plaintiff complains about general statements in Volvo brochures regarding the dependability of Volvo emissions systems, and the Volvo system's use, under normal operating conditions, of passive rather than active regeneration. But as with fuel economy, these alleged representations were not made with reference to the specific specifications, configurations and anticipated operating parameters of Plaintiff's trucks. Prolonged idle times like those experienced by plaintiff's trucks are not normal operating conditions and can result in the need for active regeneration, as an engine does not generate sufficient heat during idling for passive regeneration to occur. So Plaintiff's purported reliance upon general, pre-sale representations that were not specific to the particular operating parameters anticipated for Plaintiff's trucks was patently unreasonable. Accordingly, Volvo is due summary judgment on Plaintiff's fraud claims arising from general, presale representations about fuel economy and emission systems.

**G.    Plaintiff's fraudulent suppression claims fail because there was no duty to disclose the alleged suppressions, nor was there reasonable reliance on them.**

In count three of the complaint, plaintiff asserts the mirror image of its misrepresentation claims by alleging Volvo fraudulently suppressed that the Volvo emission systems were defective and would repeatedly cause the trucks to break down, that the trucks were not reliable, and that they would never achieve the "promised mileage improvement."   Compl. ¶ 71.   Plaintiff alleges it would not have purchased the trucks had it known the suppressed information.   *Id.* ¶  72. Plaintiff's suppression claims are deficient as a matter of law because (i) Volvo owed plaintiff no duty to disclose any internal quality or performance information on the model trucks being purchased; and (ii) plaintiff failed to reasonably rely upon suppression of any such information by Volvo.

The Supreme Court of Alabama addressed similar claims of fraudulent suppression by automobile purchasers in *Mason v. Chrysler Corp.*, 653 So. 2d 951 (Ala. 1995).   The consumer purchasers allegedly bought a Chrysler Fifth Avenue in reliance upon advertisements that the car "was a luxury car and was a quality-engineered, reliable, and smooth-riding car."   *Id.* at 952.   Chrysler advertised that the Fifth Avenue was "comparable in comfort, ride, and engineering to other large highway cars, but was much less expensive."   *Id.*   The purchasers further alleged that the Chrysler dealer's salesman had represented the car as "comparable or close

to the ride or it was like a Cadillac or Lincoln Town Car or something to that effect" and that the Chrysler warranty "was the best . . . comparable to Cadillacs and Lincoln Town cars." *Id.* But the record reflected that Chrysler "was aware of the recurring problems" with the Fifth Avenue and had supplied its dealerships with a "repair kit" to address them. *Id.* at 953. After purchasing the Fifth Avenue and experiencing recurring problems, the purchasers sued and asserted claims of misrepresentation and suppression. *Id.*

Concerning the misrepresentation claims, the court cited *McGowan* and *Fincher* to hold that the alleged misrepresentations were nothing more than statements of opinion amounting to "puffery" or predictions as to events to occur in the future. *Id.* at 953-54. The court found that these "are not statements concerning material facts upon which individuals have a right to act and, therefore, will not support a fraud claim." *Id.* at 954.

But this did not end the matter. The purchasers also asserted fraudulent suppression, alleging that under the circumstances of the purchase Chrysler "owed them a duty to disclose recurring defects in the Fifth Avenue line of cars." *Id.* The court disagreed, writing:

> This Court has stated that whether one has a duty to speak depends upon a fiduciary, or other, relationship of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances of the case. . . . When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is

not requested.  *Id.*   There was no evidence of a confidential relationship between the [consumer purchasers] and either of the two defendants, and there were no special circumstances to give rise to a duty to speak.  The [purchasers'] contacts with Chrysler Corporation consisted primarily of their viewing national advertisements before they purchased the vehicle and their presenting the vehicle for repair. Neither the [purchasers'] depositions nor their affidavits in opposition to the summary judgment motion contain any evidence indicating that they inquired of Chrysler Corporation or Royal Motor Company regarding whether problems similar to theirs had occurred in other automobiles.

* * *

The [purchasers] complain that they were assured by the salesman and by Chrysler Corporation's promotional material that the car they bought would give a smooth ride, like that of a Cadillac, and that the warranty Chrysler Corporation offered was one of the best.  They contend that these statements were false and that the dealer knew they were false.  The statements may have been false, but they were not statements of material fact that a buyer could be expected to rely on.

*Mason*, 653 So. 2d at 954-55 (internal cites omitted).  The court therefore affirmed the trial court's grant of summary judgment in favor of Chrysler Corporation and the dealership.

In *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So. 2d 883 (Ala. 2005), a commercial long-haul trucking company sued a truck manufacturer and dealer for misrepresentation and suppression, among other things.  *Id.* at 884. The trucking company purchased 40 trucks from the truck manufacturer.  *Id.*  To get the trucks more quickly, the trucking company accepted the dealer's recommendation to have the trucks manufactured in a new plant in Mexico.  *Id.* at 86.   The dealer assured its trucking company customer that there were no

difference in trucks manufactured in Mexico or America, and that "Freightliner is Freightliner." *Id.* at 887.  Although the trucking company did not specifically ask during conversations with the dealer and manufacturer's representatives "about the quality of the Freightliner products manufactured in Mexico," it did ask "6 to 12 times if there were any differences between Freightliner's American-produced trucks and Freightliner's Mexican-produced trucks." *Id.*

The 40 trucks delivered to the trucking company had significant problems and constantly broke down.  *Id.* at 88.  At trial, the trucking company presented evidence that presale mini-audits at the Mexico plant had reflected quality discrepancies above (sometimes four to five times above) the goal set by the manufacturer, and these discrepancies had exceeded those found in the manufacturer's American plants. *Id.* at 889.  The manufacturer never disclosed the mini-audit results because these were not considered public information and were only internal quality indicators for the use of individual production facilities.  *Id.*

The trucking company claimed fraudulent suppression of the mini-audit results.  *Id.* at 892.  Starting with the issue of whether the manufacturer owed a legal duty to disclose, the court observed that this "is a question of law to be determined by the trial court." *Id.* at 891 (citing *Armstrong Business Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 676-77 (Ala. 2001).  The trial court's inquiry considers and applies the following factors: "(1) the relationship of the parties; (2)

the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs' opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." *Id.* But "[w]hen the parties to a transaction deal with each other at arm's length, with no confidential relationship, *no obligation to disclose information arises when the information is not requested*." *Id.* (emphasis added).

The court found particularly important that "this transaction was an arm's length commercial transaction," *id.* at 892, writing:

> In *Shutter Shop, Inc. v. Amersham Corp.*, 114 F. Supp. 2d 1218, 1225 (M.D. Ala. 2000), the federal district court, applying Alabama law to a commercial transaction, stated:
>
>> "In commercial transactions involving parties to arm's length negotiations, however, a bright line rule generally applies: The parties have no general obligation to disclose, but each has an affirmative duty to respond 'truthfully and accurately' to direct questions from the other.
>>
>> "Thus, Alabama law presumes that the parties are capable of handling their own affairs and guarding their interests by asking reasonably specific, direct questions that will satisfy their need for information. The parties decide what information they need, and the law protects their rights to receive it."

*Whatley Contract Carriers*, 932 So. 2d at 892 (citations omitted).

Applying these principles, the court found no duty to disclose:

> [W]e recognize that, without a specific inquiry by [the trucking company], [the manufacturer] clearly had no duty to disclose any information regarding the internal audit results for the Mexico plant.

> As this Court has recognized, the law generally allows a business to keep confidential its internal operating procedures and data unless that information is specifically requested.

*Id.* (citations omitted).

Specifically addressing whether the trucking company's presale questions about "differences" between American-made and Mexican-made trucks gave rise to a duty to disclose the internal audit results, the court found the questions did not because they were "not specific enough to create a duty to disclose the results of the internal audit at the Mexico plant." *Id.* at 893.  The court explained:

> As noted in *Shutter Shop,* supra, "[a] disclosing party cannot be punished for fraudulent suppression unless the questioning party articulates with reasonable clarity the particular information it desires." 114 F. Supp. 2d at 1226.  Additionally, "[w]hile the law still requires, even in the present adversarial world of commercial transactions, that direct questions be responded to truthfully and accurately, the law also generally allows a business to keep confidential its internal operating procedures." *Ex parte Ford Motor Credit Co.*, 717 So. 2d at 787.

*Id.*  "Had [the trucking company] considered [the quality audit data] necessary to [its] decision-making process, [it] could have inquired about that data.  [It] did not." *Id.* at 895.  Having found no duty to disclose the allegedly suppressed information, the court reversed the judgment entered on the jury's verdict and remanded "for entry of a judgment as a matter of law in [the manufacturer's] favor." *Id.*

In this case, plaintiff never specifically inquired of Volvo concerning internal quality or repair data on emissions systems, breakdowns, fuel economy, or anything else.  Neither Volvo nor Action ever said anything specific enough to give rise to a duty on the part of Action or Volvo to disclose internal quality or repair data.  Certainly, no duty to disclose can be predicated upon non-actionable "puffery," future predictions, and opinions on which plaintiff had no right to rely.  *See Mason*, supra.  In the arms-length transaction between these *commercial* parties, plaintiff's failure specifically inquire about Volvo's internal quality and repair data precludes any claim of fraudulent suppression of this data as a matter of law.   Volvo is therefore due summary judgment on Plaintiff's fraudulent suppression claims.

Finally, to recover, plaintiff must prove that it reasonably relied upon the alleged suppressions to its detriment.  *See Davis v. Sterne, Agee and Leach, Inc.*, 965 So. 2d 1076, 1091-92 (Ala. 2007).  But as discussed concerning Plaintiff's misrepresentation claims, the element of reasonable reliance presents a problem for Plaintiff.  Plaintiff relied on the *performance* of the first three trucks, not anything said or not said, to purchase the second three trucks.  And with respect to all trucks, plaintiff failed to inquire, as it should have, about the anticipated performance of the *specific* trucks to be purchased given their particular specifications and anticipated operating parameters (including target speeds, rpm's, and idle time).

Plaintiff had the names of other trucking companies using Volvo trucks, yet never inquired about their experiences.  The Knight brothers had extensive experience in the trucking business, had bought and sold many trucks before, and therefore knew better than to make performance assumptions without inquiring about and discussing truck specifications, operating parameters, and other conditions.  But they profess to have done just that.  This is not reasonable reliance as a matter of law, and is yet another ground on which Volvo is due summary judgment on Plaintiff's fraudulent suppression claims.

## H.   Plaintiff's Fraud and Suppression Claims Are Barred By The Statute of Limitations.

An action based on fraud, misrepresentation, or suppression must be commenced within two-years of the date of the plaintiff's actual or constructive notice of the alleged misrepresentation or suppression.  *Ala. Code* §§ 6-2-3, 6-2-38(1); *Allen Group Leasing Corp. v. McGurgin*, 537 So. 2d 22 (Ala. 1998).  Thus, the period prescribed by the statute for filing a claim begins to run when the plaintiff, in the exercise of ordinary care, should have discovered the fraud. *Parsons Steel, Inc. v. Beasley*, 522 So. 2d 253 (Ala. 1988); *Moulder v. Chambers*, 390 So. 2d 1044 (Ala. 1980); *Geans v. McCaig*, 512 So. 2d 1308 (Ala. 1987); *Seybold v. Magnolia Land Co.*, 376 So. 2d 1083 (Ala. 1979).  For statute-of-limitation purposes, when a claim accrues is a question of law if the facts are undisputed ad the evidence warrants but one conclusion.  *Jim Walter Homes, Inc.*

*v. Kendrick*, 810 So. 2d 645, 650 (Ala. 2001) (*citing Kindred v. Burlington Northern R.R.*, 742 So. 2d 155, 157 (Ala. 1999)); *see also Ex parte Alabama Farmers Cooperative, Inc.,* 911 So. 2d 696, 702 (Ala. 2004).

Fraud "is deemed to have been discovered when it ought to have been discovered; that is, at the time of the discovery of facts that, on the part of a person of ordinary prudence, would provoke inquiry that if followed up, would lead to the discovery of the fraud." *Fabre v. State Farm Mut. Auto. Ins. Co.*, 624 So. 2d 167, 168 (Ala. 1993).

The Alabama Supreme Court has constructed what might be described as a "bright-line" test for the accrual of fraud claims when written documents are involved. The law is now clear that "fraud is discoverable as a matter of law for purposes of the statute of limitations when one receives documents that would put one on such notice that the fraud reasonably should be discovered." *Ex parte American General Finance, Inc.*, 795 So. 2d 685, 689-90 (Ala. 2000); *accord Liberty Nat'l Life Ins. Co. v. Parker*, 703 So. 2d 307, 308 (Ala. 1997); *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 422 (Ala. 1997); *Jackson v. Secor Bank*, 646 So. 2d 1377, 1379 (Ala. 1994); *Kelly v. Connecticut Mut. Life Ins. Co*., 628 So. 2d 454, 458 (Ala. 1993); *Fabre v. State Farm Mut. Auto. Ins. Co.,* 624 So. 2d at 169. The plaintiffs' failure to read the documents he receives or signs does not alter this rule. *Ex parte American General Finance, Inc.*, 795 So. 2d at 690-91; *Harrell v.*

*Reynolds Metals Co.*, 495 So. 2d 1381, 1387 (Ala. 1986). Otherwise, "contracts would not be worth the paper on which they were written." *Dobbins v. Dicus Oil Co.*, 495 So. 2d 587, 588 (Ala. 1986).

The foregoing principles are best illustrated by the Alabama Supreme Court's decision in *Ex parte American General Finance, Inc.*, 795 So. 2d 685 (Ala. 2000). In *Ex parte American General*, plaintiff Reynolds asserted a variety of fraud claims against defendants arising out of a number of loan transactions with American General that closed between 1988 and 1991. *Id.* at 687-88. Plaintiff signed the loan documents on each occasion and received copies of the documents on each occasion. *Id.* Plaintiff did not, however, read the documents before she signed them. *Id.* at 687. Plaintiff claimed that she did not discover the alleged fraud until 1996, when, for the first time, she calculated the loan payoff figure and concluded that "'something was wrong.'" *Id.* at 688. Plaintiff filed suit on August 7, 1996, "more than eight years after the first transaction had closed, and more than five years after the final transaction had closed." *Id.* at 688.

The trial court granted the defendants' motion for summary judgment based upon the statute of limitations, "given Reynolds' own admission that she had the same documentation and information in 1988 and 1991 that she states put her on notice of the alleged fraud in 1996 leading to the filing of this action." *Id.* at 688. The Alabama Supreme Court affirmed the trial court's judgment. 795 So. 2d at

686-87. The Court held that plaintiff's "fraud claims, filed in 1996, are time-barred" because the two-year limitations period "began to run, at the latest, in 1991 when Reynolds received the last set of loan documents." *Id.* at 691.  In reaching this conclusion, the Court stated as follows:

> We have held that fraud is discoverable as a matter of law for purposes of the statute of limitations when one receives documents that would put one on such notice that the fraud reasonably should be discovered.
>
> * * *
>
> Reynolds received the same documentation at each of the five separate loan transactions. Those loan documents were not vague or ambiguous. They clearly recited the amount of the loan, the amount of each monthly payment Reynolds was to receive from the Sherrins, and the number of months those payments were assigned to American General. More important, each set of loan documents (except, of course, the documents Reynolds received at the first transaction in April 1988) included the "payoff" amount of the previous loan transaction. Thus, the balance of Reynolds' debt to American General was not truly "new information" when she received it from Ms. Skipper in December 1995 (although, of course, the specific amount changes daily). At the latest, then, Reynolds had sufficient information to place her on notice of a potential fraud in May 1991, when she received documentation for the fifth and final loan.

*Id.*

In this case, plaintiff leased the first 3 trucks in July 2012, and the last 3 trucks in December 2012.  Plaintiff did not file its Complaint until January 5, 2017, four and a half years after leasing the first 3 trucks.  Thus if plaintiff had actual or constructive notice of the alleged fraud before January 5, 2015, then plaintiff's fraud claims are time barred.

Repair records for the subject trucks make clear that plaintiff had notice of the alleged fraud before January 5, 2015. Exs. 22-27. Plaintiff claims Volvo made misrepresentations concerning the reliability of the trucks, in particular their emissions systems. Among plaintiff's emissions related complaints are that faults with the emissions systems would cause the check engine light to come on, requiring service at a dealer. Additionally, problems with the emissions system could cause a truck to go into a "Derate" condition, meaning the emissions systems were not functioning properly and to prevent excess emissions the truck's computer would, if the problem went unresolved after a certain period of time, reduce the maximum speed of the vehicle to 50 mph. If the problem remained unresolved long enough, the vehicle's maximum speed could be reduced to 5 mph. In addition to Derate issues, plaintiff complains of repeat problems with the same components, for example fuel injectors.

Repair records show plaintiff was on notice of Derate and other issues with the emissions systems, and also of injector issues, long before January 5, 2015. Plaintiff had knowledge of these issues because its drivers were driving the trucks. When the trucks were taken to Volvo dealers for warranty repairs, upon completion of the repairs the dealers provided an explanation of the problem and work done, and also a written service invoice detailing the problem and the repairs made, which invoices were collected by plaintiff for its truck files. Ex. 1, pp. 121-

22, 125; Ex. 28.    Additionally, Paul Knight's responsibilities were to keep the trucks running, and therefore he was involved with and had knowledge of the service issues with the trucks, including talking with service personnel at Volvo dealerships, Action in particular, regarding issues with and repairs to the Volvo trucks.  Ex. 11. p. 17, Ex. 12, pp. 45-46, 53-55.

The warranty records show that all of the Volvo trucks experience some type of emissions related issues, or injector issues, prior to January 5, 2015, as follows:

Knight Unit 1073/VIN 137024

| | |
|---|---|
| 5/9/13 | EGR cooler tube clogged |
| 7/12/13 | Check engine light:  EGR issue |
| 3/10/14 | Derate:   SCR Performance low due to DEF build up and damaged NOX sensor |
| 6/5/14 | Complaint of engine regens too much, excess soot found |
| 6/12/14 | Derate: Active regen faults.  EGR clogged with excessive carbon buildup; 7th injector and DPR clogged, replaced 7th injector |
| 6/17/14 | Customer reports unit is shutting down, says it needs a regen and gives a Derate warning; bad EGR valve |
| 8/4/14 | Regen light is coming on, D-rate in 60 minutes message on dash |
| 8/26/14 | Won't regen, in Derate |
| 9/1/14 | *Unit in Derate/driver states it is a recurring issue* |
| 9/8/14 | Engine still smoking; replaced EGR valve, EGR cooler plugged with soot, replaced all 6 engine injectors |
| 12/23/14 | Regen issues, injector sleeves found pitted, all injector sleeves and injectors replaced |

Ex. 25 (emphasis added).

Thus plaintiff's truck 1073 alone experienced derate and regen issues, and other emissions issues, including recurring derate and regen issues according to

plaintiff's driver, prior to January 5, 2015, thereby placing plaintiff on notice of the alleged fraud.

The other Volvos plaintiff operated also experienced emissions and injector issues prior to January 5, 2015, as follows:

Knight Unit 1070/VIN 129733

| | |
|---|---|
| 12/11/12 | Check engine light: NOX sensor |
| 3/4/13 | Engine shuts down: EGR DIFF PSI sensor ports clogged, also installed new engine control software |
| 3/11/13 | Check engine light:  EGR valve |
| 3/19/18 | Check Engine light: cleaned Diff sensor ports |
| 9/26/13 | Active fault codes for EGR mass flow and EGR cooler, found bad EGR |
| 1/27/14 | Skipping when going up hill; found fault codes for EGR mass flow, EGR cooler found clogged |
| 10/16/14 | Check engine light: replace injector number 1 |

Ex. 23.

Knight Unit 1071/VIN 129734

| | |
|---|---|
| 11/12/13 | Check engine light: faulty intake sensor |
| 1/20/14 | Engine will not regen, NOX sensors damaged; also replaced all injectors with updated injectors |
| 5/12/14 | Engine not starting correctly; replaced all injectors |
| 9/2/14 | Check engine light: replace turbo, update engine software, replace number 6 injector |
| 11/14/13 | Blowing white smoke: replaced turbo |

Ex. 24.

Knight Unit 1069/VIN 129732

| | |
|---|---|
| 3/4/14 | Check engine light: updated engine software |
| 9/17/14 | Check engine light and regen issues: code for low EGR mass flow, EGR cooler plugged with soot, replaced exhaust flex pipe |

Ex. 22.

Knight Unit 1076/VIN 134963

11/5/13    Check engine light, EGR cooler stopped up
6/17/14    Engine light on: remove and replace EGR pressure differential
           sensor

Ex. 27.

Knight Unit 1075/VIN 565078

1/20/14    Check engine light on: replaced turbo, updated engine
           software, performed parked regen
4/12/14    Check engine light: code for NOX monitoring failure; updated
           software
8/26/16    Engine skipping at high speeds; replace all 6 injectors and
           injector tubes
10/31/14   Check engine light: replaced NOX sensor, installed updated
           software

Ex. 26.

Thus the remaining 5 Volvo trucks also experienced regen and check engine issues related to emissions, EGR issues, and also injector issues. Plaintiff was aware of all of these issues. Taken together with the issues discussed above for plaintiff Unit 1073, these facts establish plaintiff was on notice of the alleged fraud prior to January 5, 2015.

Additionally, the above-listed repairs in several instances mention the need for a parked regen, or codes requesting regens. The Volvo Operator's Manual for the trucks also discusses the fact that active regenerations may need to be performed on the trucks under certain duty cycles, and how and when to perform them. Ex. 29, Bates Volvo 1373, 1385-1397. Because plaintiff was on notice of these facts through receipt of the Operator's Manuals, and from actually

performing parked regenerations prior to January 5, 2015, plaintiff cannot maintain any fraud claims based on statements in Volvo brochures that, under normal operation, Volvo emissions technology uses passive regeneration, and no active regeneration is required.

I.   **Plaintiff Cannot Recover Lost Profits Damages For The Year 2017 Based Upon The Performance of Freightliner Trucks and Not The Subject Volvos**

At the end of 2016, plaintiff stopped operating the Volvo trucks, and replace them with 6 used Freightliners.  Ex. 1, pp. 219, 221-22, 235-39.  Therefore the Volvo trucks did not operate in 2017.  Paul Knight testified the Freightliners performed very well in 2017, and had almost no down days.  *Id.* at 240.  Plaintiff, however, seeks to recover damages against Volvo for 2017 for the performance of the Freightliners.  Plaintiff's damage expert Gould calculated lost profits for 2017 attributable to operation of the Freightliners based upon the Freightliners' failure to meet his assumed gross revenue goal of $900 per operational day, or $22,500 per year.  Ex. 21, pp. 132-33.  Gould then treated the shortfall in earnings of the Freightliners as if they in fact resulted from the operation of the Volvos.

As a matter of law, plaintiff cannot seek damages from Volvo based upon an alleged gross revenue shortfall of the Freightliners.  Plaintiff had a duty to mitigate its damages.  *See Atkins v. Alabama Drydock & Shipbuilding Co.*, 195 F. Supp. 944 (S.D. Ala. 1960).  Plaintiff chose to mitigate by acquiring and running the

Freightliners instead of the Volvos.  Once plaintiff replaced the Volvos with the Freightliners, its damages for 2017 are limited to any costs of mitigation, and any other damages that were caused by the Volvos.

However, any failure of the Freightliners to meet Gould's gross revenue target is not a mitigation cost.  Further, because the gross revenues earned have nothing to do with the type of truck that delivered the freight, but instead is determined solely by the rate the customer pays, which is set by the market, any claimed shortfall in gross revenue earned by the Freightliners cannot be said to have been caused by the Volvo trucks.  Ex. 21, pp. 71-86.  In short, plaintiff cannot blame the Volvos for any alleged failure of the Freightliners to earn a certain amount of gross revenue.  Because plaintiff cannot causally relate these damages to the Volvos, it cannot recover them against Volvo.  Because the Volvo trucks cannot be said to have caused any alleged revenue shortfall of the Freightliners, plaintiff cannot recover from Volvo damages for alleged lost profits in 2017 resulting from operation of the Freightliners.

**J.**     **Plaintiff Cannot Recover Damages For The Years 2018-2022 As Plaintiff Did Not Lease Any Volvo Trucks During Those Years.**

All of the leases of the Volvo trucks expired by their own terms by the end of 2017.  Yet plaintiff seeks to recover lost profits for a second five year lease period, from 2018-22.  The sole basis of plaintiff's damages expert Gould's opinion that such damages are recoverable is Paul Knight's statement that in 2012,

when plaintiff leased the first 6 Volvos, plaintiff intended at the end of the first leases to lease 6 more new Volvo trucks for 5 more years. *Id.* at 153-55. However, it is undisputed that plaintiff never entered into any leases of Volvo trucks after the first leases. It is also undisputed that plaintiff was under no obligation, contractual or otherwise, to lease more new Volvos at the end of the terms of the first leases. *Id.* at 155-57. Plaintiff was free not to lease any more new trucks at all, or to lease new trucks made by a truck manufacturer other than Volvo. *Id.* Whatever plaintiff might have done in this regard at the end of the term of the initial Volvo leases is pure speculation, dependent upon market conditions in the trucking industry at the time, the price of leasing new Volvo trucks in comparison to new trucks made by Volvo's competitors, and other factors.

It is axiomatic that plaintiff cannot recover damages which are too speculative or based on speculation. *Bank v. Key Hotels of Brewton,* LLC, 2016 WL54926, at *2 (S.D. Jan. 5, 2016)(proof of damages "need not be to a level of absolute certainty; however, there must be a sufficient showing that the damages award is not speculative), *citing Atchafalaya Marine, LLC v. Nat'l Union Five Ins. Co. of Pittsburgh, Pa.*, 959 F. Supp. 2d 1313, 1327 (S.D. Ala. 2013), *Parsons v.* Aaron, 849 So. 2d 932,949 (Ala. 2002); *see Alabama Power Co. v. Alabama Public Serv.Comm'n*, 103 So. 2d 14, 17 (Ala. 1958) ("One of the fundamental rules of damages is that to be compensable they must be direct and reasonably certain,

not remote and speculative."); *Crommelin v. Montgomery Indep. Telecasters, Inc.*, 194 So. 2d 548, 551 (Ala. 1967) ("[N]either the fact nor amount of damages, nor the cause of the damages, can rest solely on speculation.").   Additionally, the guidelines of the American Institute of Certified Public Accountants ("AICPA"), of which Mr. Gould is a member, for calculating lost profits provide, for this very reason, that when calculating lost profits resulting from a breach of contract, one does not extend the damage period beyond the term of the contract.  Ex. 30.  In this case, plaintiff's claim for damages based on a second 5 year lease period is too speculative, and therefore fails as a matter of law.

## V.   CONCLUSIONS

Wherefore, defendant Volvo is entitled to partial summary judgment on plaintiff's fraud claims, Count Two and Three of the Complaint, and on plaintiff's claim for lost profits for the years 2017, and 2018-22.

*s/ John C. Morrow*
John C. Morrow (ASB-9424-O77J)
Matthew D. Centeno (ASB-9270-X18M)
Attorneys for Defendant Volvo Group North America, LLC d/b/a Volvo Trucks North America

BURR & FORMAN, LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
jmorrow@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document by Notice of Electronic Filing, or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail, hand delivery, fax or email on this the 13th day of August 2018:

Richard H. Gill (ASB-7945-G70R)
Copeland, Franco, Screws & Gill, PA
P.O. Box 347
Montgomery, AL 36101-0347
Tel.: (334) 834-1180
gill@copelandfranco.com

Jonathan H. Waller (ASB-0725-L53J)
Waller Law Office, PC
2001 Park Place, Suite 900
Birmingham, AL 35203
Tel.: (205) 313-7330
jwaller@waller-law.com

*s/ John C. Morrow*
OF COUNSEL