**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **KNIGHT & SON TRANSPORTATION, INC.,** | ) <br> ) <br> ) <br> ) |
| **Plaintiff,** | ) <br> ) |
| **v.** | ) <br> ) |
| | )    **CASE NO.: 1:17-CV-00006-CSC** |
| **VOLVO GROUP NORTH AMERICA, LLC d/b/a VOLVO TRUCKS NORTH AMERICA,** | ) <br> ) <br> ) <br> ) |
| **Defendant.** | ) <br> ) <br> ) |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Volvo Group North America, LLC d/b/a Volvo Trucks North America ("Volvo"), submits its reply to plaintiff Knight & Son Transportation, Inc.'s Opposition to Volvo's Motion for Partial Summary Judgment.

## I.  INTRODUCTION

This is a breach of warranty case.  Plaintiff's attempt to turn it into a fraud case is akin to trying to fit a square peg into a round hole—the fact that plaintiff's fraud claims do not fit, and are unsustainable, is borne out by multiple legal shortcomings.  These shortcomings include claims based on statements that are not actionable because they are sales puffery, are too general to sustain a misrepresentation claim, are statements of opinion and not fact, or are statements about future events, none of which are actionable, or can be reasonably relied

upon, as a matter of law.  Further, plaintiff attempts to hold Volvo liable for alleged representations of Action Truck Centers of Dothan, Inc. ("Action") salesman Jeff Thomley, yet there is no agency relationship between Volvo and Action as a matter of law.

Additionally, plaintiff seeks to inflate its damages by claiming (1) alleged lost profits due to plaintiff's operation in 2017 of six Freightliner trucks in mitigation of its damages, and (2) future lost profits based on the premise of a hypothetical future lease of more Volvo trucks.  Plaintiff's claim for lost profits in 2017 fails as a matter of law because there is no causal relation between any alleged failure of the Freightliners to earn gross revenue and any of plaintiff's claims regarding the Volvos.  Likewise, plaintiff's attempt to seek future lost profits from a purported future five-year lease of Volvo trucks fails as a matter of law because plaintiff has alleged no legal wrong that would sustain the imposition of damages based upon a new, future lease of different trucks than those made the basis of the Complaint.

## II.   ARGUMENT

### A.   Plaintiff Has Not Offered Proof Sufficient To Create A Genuine Dispute Of Fact On Agency.

Plaintiff correctly points out that most disputed questions of agency are for the jury. (Doc. 48, p. 22)  But this does not mean the agency issue should never be decided as a matter of law.  "When a defendant's liability is to be based on agency,

agency may not be presumed; rather, when on a motion for summary judgment a defendant has made a prima facie showing that there was no agency relationship, the party asserting agency has the burden of presenting substantial evidence of the alleged agency."  Malmberg v. American Honda Motor Co., Inc., 644 So. 2d 888, 890 (Ala. 1994).

"Whether an agent/principal relationship exists depends upon whether there is evidence of a retained right of control, whether the control is exercised or not." McLemore v. Ford Motor Co., 628 So. 2d 548, 551 (Ala. 1993).  Plaintiff relies on the testimony of Action salesman Thomley, along with that of Jeff Knight, to meet its *prima facie* burden: "With regard to the facts, Thomley's testimony demonstrates that Volvo retained the right to control Action and its representatives with regard to their sales of and representations regarding Volvo Trucks, i.e., that they had a principal/agent relationship.  Volvo directed the sales pitch Thomley was to use.  Thomley was a conduit for Volvo.  In addition, the testimony of Thomley and Jeff Knight establishes that Volvo brochures were used to sell Knight and these brochures contained material misrepresentations."  Doc. 48, p. 22. Contrary to plaintiff's claim, nothing suggests that Volvo had the right to *control* what Thomley chose to say or not say when selling the trucks to plaintiff.

To be sure, Thomley testified that Volvo made sure he was educated about Volvo trucks.  Thomley attended annual classes at Volvo's facility in Dublin,

Virginia and also participated in online training and tests to remain certified to sell Volvo trucks.  (Doc. 42-5, pp. 3-4).  But Thomley never said that Volvo required him to follow any sort of sales script or otherwise controlled his sales pitches. Indeed, Thomley specifically testified that he was not given any "sales pitch" regarding Volvo's SCR system, id. at 6-7, and he only retained "some" of the written materials provided by Volvo.  Id. at 4.

Furthermore, plaintiff points to nothing in Jeff Knight's testimony or the referenced Volvo brochures establishing that Volvo had the right to control what *Action* or *Thomley* said when selling.  To be clear, Volvo retains complete responsibility for anything said in its own brochures (addressed elsewhere in this brief).  But nothing in the brochures establishes any right of control by Volvo over *Action* or *Thomley*.

In short, proof that Volvo educated Action's sales personnel and supplied them with brochures does not establish the requisite right of control foundational to an agency relationship.  The Supreme Court of Alabama held as much in John Deere Construction Equipment Company v. England, 883 So. 2d 173 (Ala. 2003). There, the manufacturer of a "skidder" used in logging operations had become aware of various mechanical flaws by the time its "authorized dealer" sold a used skidder to a logger.  Id. at 174-75.  The logger later sued both the skidder's manufacturer and dealer for, among other things, fraudulently representing "that

the skidder was free of defects and was suitable for its intended use," and fraudulently suppressing "material facts regarding the hydraulic system of the skidder." Id. at 175.

To prove agency, the logger showed among other things that the dealer displayed the manufacturer's "logos, signs, and literature." Id. at 182. The dealer also "agreed to send its personnel to conferences and training schools provided by [the manufacturer]" and to "provide service equipment and to maintain an adequate stock of service parts and the appropriate tools necessary to fulfill the warranty obligations of [the manufacturer] . . . ." Id. at 181. Furthermore, as Justice Johnstone pointed out in dissent, the manufacturer's corporate representative testified at trial: "We communicate to our customers through our dealers, through the independent dealers." Id. at 184. Nonetheless, the Supreme Court held that "[a]s a matter of law, this evidence is insufficient to create a jury question on the issue of actual agency." Id. at 181. Nor did the evidence establish a jury question on the issue of apparent agency. Id. at 182.

Likewise in this case, that Volvo educated Thomley and supplied him with sales literature does not, as this plaintiff argues, establish a jury question on agency. Plaintiff has simply offered no proof that Volvo had the right to control Action or Thomley inconsistent with the following provision in Action's Dealer Agreement:

1.1    Relationship Between Company and Dealer

The Dealer is an independent contractor, not the agent of the Company.   The Dealer therefore has no authority to bind the Company to a third party.

The Dealer also is solely responsible for its own acts and omissions.

(Ex. 2, Bates Volvo 001494).

Finally, Malmberg v. American Honda Motor Co., 644 So. 2d 888 (Ala. 1994), does not as plaintiff suggests "eviscerate" Volvo's position of no evidence establishing apparent authority in this case.  The evidence in Malmberg established among other things that "Honda *controlled* the advertising by dealers by *requiring* certain types and kinds of signs, *and* it authorized the promotion and display of Honda trademarks.  American Honda *imposed* upon its dealers the obligation to 'expressly provide to a customer that [an American Honda] warranty goes with' the vehicle."  Id. at 889 (emphasis added).  Plaintiff came to the dealership after seeing a "Honda" advertisement in a newspaper.  Id. at 889-90.  When purchasing her car, she "felt comfortable that she was dealing with 'Honda,' because she saw Honda brochures, booklets, awards, and plaques on the walls."  Id. at 890.

After being told by the dealer at the time of purchase that the "factory" warranty still covered the car with only 8,308 miles, the purchaser later learned that the car was not covered because it had been wrecked.  Id.  She sued for fraud, and the Supreme Court held Honda responsible for its dealer's misrepresentation

on the basis of apparent authority, writing that the purchaser "relied on the representation of [the dealer] regarding the extent of the Honda warranty available on the vehicle she purchased from [the dealer] *as being a representation of American Honda*." Id. at 891.

So Malmberg stands for the straightforward proposition that an automobile manufacturer may control its dealer's advertising and communications to the point that the customer can no longer distinguish between dealer and manufacturer with respect to the source of representations being made. That is not the case here. Plaintiff has offered no evidence that Volvo *mandated* or controlled Action's advertising or communications with customers concerning warranties or anything else, much less of having done so to the point that plaintiff reasonably believed it was dealing with Volvo. Action's use of Volvo trademarks, logos, and product literature cannot, standing alone, create an inference of agency. See Malmberg, 644 So. 2d at 891. Accordingly, since plaintiff has not offered *prima facie* proof of actual or apparent agency, Volvo is due summary judgment in its favor on any and all claims of misrepresentation or suppression based upon communications by Action or Thomley.

**B.  Plaintiff Could Not Have Reasonably Relied Upon The Claimed Misrepresentations Or Suppressions As A Matter Of Law.**

Plaintiff says virtually nothing to justify its purported reliance on the claimed misrepresentations and suppressions, but this remains a necessary element

of plaintiff's proof.  *See* AmerUS Life Ins. Co. v. Smith, 5 So. 3d 1200, 1207 (Ala. 2008)(reliance an element of misrepresentation); Coilplus-Alabama, Inc. v. Vann, 53 So. 3d 898, 909 (Ala. 2010)(reliance element of suppression claim).   The Supreme Court of Alabama has explained the element of reliance as follows:

> A plaintiff's purported reliance in an action alleging misrepresentation or suppression must be reasonable: The right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests.  In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances.

Sandoz, Inc. v. State, 100 So. 3d 514, (Ala. 2012)(internal quotes omitted); see also Houston Cnty. Health Care Auth. v. Williams, 961 So. 2d 795, 814 (Ala. 2006)("Additionally, a plaintiff in a suppression case must prove that [it] was induced to act by [its] *reasonable reliance* on the state of affairs as it appeared in the absence of the suppressed information . . . ." (emphasis added)).

"We carefully scrutinize the plaintiff's case in fraud action because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests."  Cornelius v. Austin, 542 So. 2d 1220, 1222 (Ala. 1989)(internal quotes omitted).   Thus, plaintiffs may not be said to have *reasonably* relied on an alleged misrepresentation or suppression "when they have been presented with information that would either *alert* them to any alleged fraud or would *provoke inquiry* that would uncover such alleged fraud."  AmerUs Life Ins. Co., 5 So. 3d at 1216 (noting that language in documents received by the

plaintiff "should have provoked inquiry or a simple investigation of the facts" and that the plaintiff is "then charged with knowledge of all the information that the inquiry would have produced").

Finally, the axioms that misrepresentation or suppression may not be predicated upon sales puffery, opinions, generalities or future predictions are corollaries of the requirement that reliance must be reasonable.  "[S]tatements of opinion amounting to nothing more than 'puffery' or predictions as to events to occur in the future are not statements concerning material facts upon which individuals have a right to act and, therefore, will not support a fraud claim." Fincher v. Robinson Bros. Lincoln-Mercury, Inc., 583 So. 2d 256, 259 (Ala. 1991); see also 37 C.J.S. Fraud § 19 (Thomson Reuters 2018) ("The representation must contain the essential elements of fraud, and it must be unqualified, definite, and specific.  Mere vague, general, or indefinite statements are insufficient, because they should ordinarily put the hearer on inquiry, and there is no right to rely on such statements.")(citations omitted).

Applying these standards, plaintiff clearly could not reasonably rely upon the claimed misrepresentations and suppressions as a matter of law.

### 1.    <u>Alleged Promise that Volvo would "stand behind" its warranty</u> <u>obligations</u>

Plaintiff claims that Thomley promised "that if Knight bought these trucks, then Knight could depend on Volvo to stand behind and honor its warranty obligations."   Doc. 48, p. 12.   Thomley's statement, even if made, does not constitute actionable misrepresentation as a matter of law.

First, as discussed above, Thomley was not Volvo's agent at the time of the statement and therefore could not speak on behalf of Volvo.

Second, and more fundamentally, Thomley's statement was not one of material existing fact, but of general puffery or opinion about Volvo's anticipated future performance.    Such statements cannot constitute actionable misrepresentation as a matter of law.  <u>See</u>, <u>e.g.</u>, <u>Fincher v. Robinson Bros. Lincoln-Mercury, Inc.</u>, 583 So. 2d 256, 259 (Ala. 1991)("[S]tatements of opinion amounting to nothing more than 'puffery' or predictions as to events to occur in the future are not statements concerning material facts upon which individuals have a right to act and, therefore, will not support a fraud claim").

Third and finally, even if plaintiff had attempted to plead a claim for promissory fraud (which it has not), Thomley's purported statement would still not be actionable for additional reasons.  To succeed on a claim of promissory fraud, a plaintiff must prove two elements in addition to those of misrepresentation: "proof

that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and . . . proof that the defendant had an intent to deceive." Ex parte Moulton, 116 So. 3d 1119, 1144 (Ala. 2013). By plaintiff's own admission, Thomley believed the statement to be true when made: "Thomley believed that the statements he made to the Knights in 2012 about . . . Volvo honoring its warranty obligations were true . . . ." Doc. 48, p. 12; Knight Aff., Doc. 42-8, ¶ 3 (accepting and adopting Thomley's testimony). Thus, the statement cannot constitute actionable promissory fraud because it was not accompanied by a present intention not to perform and to deceive.

### 2.    Alleged Misrepresentations Regarding Fuel Economy

Plaintiff has not shown that Volvo's statements regarding fuel efficiency of the trucks were more than sales puffery, or were otherwise specific enough to support a claim for misrepresentation. Plaintiff relies heavily on two alleged facts, (1) that Volvo allegedly represented the trucks would get 5% better fuel economy than competitor trucks, and (2) that a Volvo Fuel Test Match Race showed a Cummins engine achieved better fuel efficiency than the Volvos. But Volvo made neither assertion, and therefore neither creates a fact issue warranting denial of Volvo's motion. Doc 48, pp. 17-18. .

First, Volvo never made a statement that the D13 engine would achieve 5% better fuel efficiency than competitor trucks. Instead, Volvo's brochure states that

the D13 "can deliver 5% better fuel efficiency*.":  Doc. 29-15, p. 2.  Plaintiff

failed to mention the "asterisk" which footnotes to a statement in the brochure that

"Testing shows that under everyday driving conditions, this new generation of

Volvo engines can deliver 5% better fuel efficiency *than our highly efficient EPA*

*'07 engines*."   Id. (emphasis added).    Thus plaintiff mischaracterizes this

representation in several ways.  First, the representation does not state that the

engine will achieve 5% better fuel efficiency, only that it "can."[1]  Second, the

statement refers only to improvement over Volvo's 2007 engines, not competitor

engines compliant with EPA 2010 regulations.  Third, the brochure expressly states

these efficiencies are achieved "under everyday driving conditions."   Thus the

statement expressly excludes the impact of plaintiff's excessive idle time, over

50%.  Finally, there is no evidence that this representation is false, i.e. that Volvo's

2010 D13 engine did not achieve 5% better fuel economy under everyday driving

conditions than its 2007 D13 engine.  Nor has plaintiff presented any evidence of

the fuel economy achieved by its truck, idle time excluded.

Plaintiff also references a statement in the same Volvo brochure that the

"Volvo D-13 engine for EPA 2010 and beyond delivers the best fuel economy of

any 13 liter coach engine out there."  Doc. 29-15, p. 2.  However, this is a brochure

---

[1] Obviously the amount of efficiency achieved depends upon how the truck
in which the engine is placed is specified, and how the truck is operated.

about buses, not trucks.  The term "coach" refers to a bus, and indeed the brochure itself contains photographs of buses, not heavy trucks.   Doc. 29-15, p. 13.  Although the brochure was produced in discovery, it is irrelevant.  Indeed, there is no evidence that Action salesman Thomley ever delivered this brochure to plaintiff.  And even if he did, plaintiff cannot be said to have reasonably relied on a brochure about use of the D13 engines in buses.  Finally, there is no evidence that this representation is in fact false—that the D13 was not in fact the most fuel efficient 13 liter coach engine at the time.

Plaintiff's reliance on a Volvo "Fuel Economy Match Race Test" is equally misplaced.  Plaintiff claims the test showed that a Kenworth truck equipped with a Cummins engine outperformed the Volvo, and since the Volvo trucks at issue could have been sold with a Cummins engine, Volvo's alleged representations regarding fuel economy at the time of sale were false.  Doc. 48, p. 18.  However, plaintiff attached the wrong Fuel Economy Match Race Test as an exhibit to its opposition.  Doc. 42-9.  The test plaintiff attached as Exhibit I to its Opposition, dated December 21, 2010, did not test a Kenworth with a Cummins engine, but tested a Volvo truck equipped with a Cummins engine.  Id. at p. 2.  The test results showed the Volvo with the Volvo engine performed better than the Volvo with the Cummins engine.  Id.

The Fuel Economy Match Race to which plaintiff presumably refers, also produced by Volvo, is attached hereto as Exhibit A.  This test did include a Kenworth equipped with a Cummins engine.  However, the test is irrelevant as it is dated June 6, 2013, after the lease of the subject trucks to plaintiff in 2012. Therefore it is not evidence of misrepresentation by Volvo at the time of sale. Further, even this test contains the following clarifying language:

> While every attempt is made to either correct or account for all of the conditions that can cause variations in the test results, it remains impossible to account for all the variations in performance of a single truck amongst the norm of the group it represents…   There is no feasible way to know whether any truck is on the 'high or low side' of a bell curve representing the nominal performance of the group.

Ex. A., p. 12.

Volvo does not publish miles per gallon fuel economy data for its trucks, as fuel efficiency is determined by how the trucks are specified, and how they are operated.  Volvo brochures clearly state the importance of properly specifying the trucks to achieve maximum fuel economy.  Doc. 29-16, p. 3.  ("It is critical to specify the truck properly to achieve maximum fuel economy").  Further, Volvo's statements regarding fuel economy are at most broad and general statements, e.g., "The proven Volvo D13 represents a giant step forward in terms of fuel efficiency…,"  Doc. 29-15, p. 2, or contain qualifying language such as "under everyday driving conditions."  Doc. 29-15, p. 2.

Thus plaintiff has not even shown that Volvo's statements regarding fuel economy are false.  Further, under these circumstances, as a matter of law plaintiff cannot have reasonably relied on the alleged misrepresentations.  At best the statements are puffery and too general, and limited in context to "normal everyday driving conditions."

### 3.    Alleged Misrepresentations Regarding "Active Regeneration"

Plaintiff has not shown that the representations in Volvo's sales brochures regarding "regeneration" were false, or were anything more than puffery, or were not too general to sustain a claim for misrepresentation.  It is clear from Volvo's brochures that they speak of Volvo's "no regen strategy" which is that active regeneration is not required under *normal driving conditions or normal on highway operation*:

> For EPA '10, the Volvo SCR solution eliminates soot using only passive regeneration in *nearly* all applications.  This *virtual* elimination of active regeneration is what we call the "no regen engine."  *For normal on highway operation,* active regeneration has been totally eliminated.

Doc. 29-18, p. 3. (emphasis added).

> Active regeneration is a thing of the past.  A DPF accumulates matter that periodically must be burned off using a process called regeneration.  With Volvo's 2010 SCR technology, this regeneration occurs automatically—and the driver proceeds without even being aware that the process is taking place.  *Under normal driving conditions,* there's never a need to park and perform an "active regeneration."

Doc. 29-15, p. 9 (emphasis added).

Thus Volvo did not, as plaintiff claims, represent that with its no regen strategy there will never be a need for active regeneration under any circumstances or any operation. Obviously, Volvo's "no regen" strategy is predicated on normal *driving* conditions. The Volvo brochures explain generally how the strategy works, with operating temperatures sufficient to burn off soot under normal *driving* conditions. There is no evidence that, under normal driving conditions, and assuming a truck was working properly, that these statements in the Volvo brochures were false. Indeed, plaintiff has admitted that the subject trucks ran properly, and had no active regeneration issues, for over the first two years of operation, from July 2012 to the spring of 2015.

Plaintiff claims in its Opposition that Volvo failed to disclose to plaintiff that high idle times could result in the need for active regeneration. Doc. 48, p. 6. Plaintiff did have high idle times, exceeding 50% of engine hours. Yet the Volvo brochures' references to normal "driving conditions," and normal "on highway operation," necessarily exclude idling, because by definition a truck that is idling is not driving or operating on a highway. Jeff Knight admits in his affidavit that "idle time occurs when a driver is resting in a truck for periods required by the Department of Transportation. Operating the engine is necessary to cool or heat the truck during these periods of time." Doc. 42-8, ¶ 57. Volvo only represented

that its emissions system needs no active regeneration under normal highway driving. Volvo made no misrepresentation about the need for active regeneration given long periods of idle times when a truck is parked off the highway. There is no evidence that Volvo's actual representations were false.

### 4. Alleged Misrepresentation Regarding SCR in Europe

Plaintiff claims that Volvo misrepresented that its U.S. 2010 emissions system was more reliable because the technology had been tested and proven in Europe, giving Volvo an advantage over its competitors. Here again, these statements are too general to be actionable. Moreover, they are nothing more than statements of opinion and sales puffery. The brochures in question do not specify any particular measures of reliability, any particular tests performed, or any particular operating, regulatory or environmental conditions involved. Plaintiff therefore cannot blindly trust the claim without further inquiry. See Torres v. State Farm Fire & Casualty Co., 438 So. 2d 757, 759 (Ala. 1983) ("If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maximum applies, '*volunti non fit injuria* '").

**C.**  **Plaintiff Cannot Recover Lost Profits Damages Allegedly Resulting From Operation Of The Freightliner Trucks Because Lost Profits Is Not A Proper Measure Of Plaintiff's Post-Mitigation Damages**

In its response plaintiff admits that in 2017 it mitigated its damages by replacing the six Volvo trucks with six Freightliner trucks.  Doc. 42, p. 41. Plaintiff further admits that in replacing the Volvos, the Freightliners served the same customers, on the same routes, driven by the same drivers, as the Volvos.  Id. Plaintiff also admits that the Freightliners performed well with no significant down time.  Doc. 29-1, p. 74.

Because of the duty to mitigate, it is well-settled that "a plaintiff can recover only for that damage or loss that would have been sustained if the plaintiff had exercised such care as a reasonably prudent person would have exercised under like circumstances to mitigate the damage or loss."  Avco Financial Services, Inc. v. Ramsey, 631 So. 2d 940, 942 (Ala. 1994).  Put simply, plaintiff is only entitled to recover any shortfall between its reasonable mitigation efforts and its actual damages.

In this case plaintiff's claimed lost profits damages are not recoverable because they do not constitute, and are not causally related to, any alleged shortfall between plaintiff's mitigation efforts and its actual damages for 2017.  First, lost profits clearly are not a mitigation cost.  Second, plaintiff's alleged lost profits are not damages which plaintiff was unable to mitigate, as there is no causal relation

18

between plaintiff's claimed lost profits and any shortfall from plaintiff's mitigation efforts.  See Mannington Wood Floors, Inc. v. Port Epes Transport, Inc., 669 So. 2d 817, 823 (Ala. 1985) ("In order that it may be a recoverable element of damages, the loss of profits must be the natural and proximate, or direct, result of the breach complained of…").

Plaintiff's lost profits claim is premised upon the notion that the Volvo trucks should have earned an assumed, or targeted amount, of gross revenue.  From this assumed gross revenue plaintiff deducts expenses to arrive at lost net revenue, i.e. lost profits.

Such lost profits, however, are not causally related to any shortfall in plaintiff's mitigation efforts because the type of truck used to deliver freight does not determine and is unrelated to the amount of gross revenue earned for the delivery.  Gross revenue is simply the amount the customer pays for the delivery of freight, and is the same whether the freight is delivered by a Volvo or a Freightliner.  It is undisputed that the Volvos are not able to deliver more freight, or operate more hours, or travel more miles, than the Freightliners, as both trucks are subject to the same highway weight restrictions and driver hour limitations in the Federal Motor Carrier Regulations.  Thus when both trucks are operating normally, neither can deliver more freight or earn more gross revenue than the other.  Plaintiff has not presented any evidence that the Volvos, had they operated

in 2017 and operated without any issues, would have been able to earn more gross revenues than the Freightliners did.   Conversely, plaintiff has not shown any difference in the Freightliner trucks which would have prevented them from earning any gross revenues that plaintiff claims the Volvos should have earned. Because neither the use of Volvo or Freightliner trucks determines the amount of gross revenue earned for freight delivered, plaintiff's attempt to claim lost profits in 2017 based upon the Freightliner's failure to achieve a certain gross revenue target is improper and contrary to law.

The fallacy of plaintiff's lost profits claim for 2017 is readily apparent when one considers the proper way to assess whether there has been a shortfall between plaintiff's mitigation efforts and its actual damages.   The proper question centers not on gross revenues, which are unrelated to the trucks, but instead, on costs. Namely, did the Volvo trucks afford any operational cost savings which plaintiff could not obtain through use of the replacement Freightliners?   For example, did the Freightliners have higher maintenance or fuel costs than the Volvos?[2]   While plaintiff claims the Volvos were represented to achieve better fuel economy, plaintiff has done no analysis of any alleged increased fuel costs of the Freightliners over the Volvos.   Nor has plaintiff presented any evidence of

---

[2] Driver cost is not an issue as plaintiff used the same drivers for the Freightliners as for the Volvos.

increased maintenance or repair costs of the Freightliners as compared to the Volvos.  Further, any such alleged differences may be offset by the decreased cost to lease and insure the Freightliners as compared to the Volvos.  Regardless, plaintiff has not attempted to calculate the proper measure of damages here, which is whether plaintiff was unable to mitigate all of its damages due to differences in operating costs between the Volvos and the Freightliners.  Because the type of truck has no causal effect on gross revenue earned, plaintiff cannot claim lost profits for 2017 when it mitigated its damages by operating the Freightliners.

Plaintiff's reliance on Avco Financial Services, Inc. v. Ramsey, 631 So. 2d 940 (Ala. 1994), is misplaced.   Avco merely stands for the proposition that whether a party has taken reasonable steps to mitigate its damages may be a fact question.  Id. at 943.  But that is not the issue here.  Volvo does not challenge plaintiff's use of the Freightliners to fulfill its duty to mitigate.  Instead, the issue is whether as a matter of law alleged lost profits from operation of Freightliner trucks are a proper measure of post-mitigation damages for plaintiff.  Here, there is no factual dispute that gross revenues are not affected by whether the freight is delivered by a Volvo or Freightliner truck.  The issue is one of causal relation, and plaintiffs cannot show a gross revenue shortfall, and thus lost profits damages, resulting from any differences between the Volvo and Freightliner trucks.  This

causal relation issue, based on these undisputed facts, is a question of law for the Court.

**D.** **Plaintiff Has Not Shown A Legal Basis For Claiming And Recovering Lost Profits Damages Resulting From A Hypothetical Future Five Year Lease**

Plaintiff relies on Alabama's "reasonable certainty rule" for the proposition that it is entitled to claim future lost profits from a second, future five year lease of six more new Volvo trucks, based on plaintiff's assertion, to its damages expert Robert Gould, that plaintiff intended to lease six more new Volvo trucks at the end of the five-year lease terms of the subject trucks.   Doc. 48, p. 42.   Plaintiff's reliance on the reasonable certainty rule is misplaced, however, as that is only a rule "governing the burden of proof borne by previously unestablished businesses to show the loss of anticipated profits." Mannington Wood Floors, Inc., 669 So. 2d at 822; see Kirkland & Co. of Anniston, P.C. v. A&M Ford Serv., Inc., 579 So. 2d 1278, 1285 (Ala. 1991) ("In Alabama, anticipated profits of an unestablished business may be recovered if such damages are proved with 'reasonable certainty'").   Here, plaintiff is not an unestablished business.   Further, that plaintiff seeks to recover lost profits from a non-existent, future five year lease does not transform this case into one involving an unestablished business.   Instead, the rule of certainty does not apply because there is no underlying legal wrong or act that gives rise to a claim for lost profits from a future lease of different trucks.

In the cases cited by plaintiff there was a legal wrong that was directly and causally related to the claim of future lost profits in connection with an unestablished business.  For example, Super Valu Stores, Inc. v. Peterson, 506 So. 2d 317, 320-21 (Ala. 1987), involved the breach of an express written contract for operation by plaintiff of a grocery store to be constructed by defendant.  Similarly, Johnson v. A.T. Stephens Enterprises, Inc., 815 So. 2d 511, 517 (Ala. 2001) involved a contract whereby plaintiff was to provide transportation services, including trucks and drivers, to defendant for a year.

In this case, however, there is no legal wrong for which Volvo can be held responsible, which proximately caused damages, or from which damages would normally and naturally result, for a second five year lease period from 2018-2022. See Mannington Wood Floors, Inc., 669 So. 2d at 823 ("In order that it may be a recoverable element of damages, the loss of profits must be the natural and proximate, or direct, result of the breach complained of. . ."); Marsh, Alabama Law of Damages, § 2:4 (6th ed., February 2018 update) ("Damages recoverable for a breach of contract are those that arise naturally and normally from the breach of the contract and those that the parties should have contemplated"); Id. at § 2.3 ("Damages that are the legal and natural result of the act done, through contingent to some extent, are not for remote to be recovered").

Here, Volvo's alleged breach of warranty, and alleged misrepresentations in connection with plaintiff's lease of the six subject Volvos, are not legal wrongs or acts the natural and legal consequence of which could be expected to result in damages from the lease of different trucks in the future.  First, there is no contract between Volvo and plaintiff for the lease of any trucks.  Volvo is not a party to the leases of the subject trucks, which are between plaintiff and the leasing entities GM Capital Finance and Volvo Financial Services.  Further, Volvo's warranty of the subject trucks in no way subjects it to liability for future trucks.  Second, there is no legal obligation on the part of plaintiff to lease more new Volvo trucks, or of the leasing companies to lease more trucks to plaintiff, or of Volvo to sell more trucks to the leasing companies.  Third, plaintiff's alleged misrepresentations on the part of Volvo as to the performance of the six subject trucks can only be said to apply to the subject trucks.  Nowhere is it alleged, and indeed it cannot be alleged, that Volvo made representations as to performance of future trucks.

Thus regardless of what plaintiff claims its "plan" may have been upon expiration of the lease terms of the subject trucks, plaintiff can point to no legal act or wrong by Volvo which would enable plaintiff to seek damages based on a new, future lease, or new, future trucks.  Such damages would not only be without a legal basis, but would be an exercise in pure speculation.  For example, would plaintiff decide to lease more Volvo trucks, or lease trucks from a Volvo

competitor, based on price or any number of other considerations?  Would plaintiff financially qualify with the leasing companies to lease more trucks?  Would plaintiff decide to return to operating cheaper, used trucks, as it did when it replaced the Volvos in 2017 with Freightliners?  Even if plaintiff did lease new Volvo trucks in 2018, it is further speculation as to whether it would lease the same engines or trucks, as they will likely have been modified and improved since 2012, and also may not have the same warranties.  Plaintiff cannot recover damages that are so speculative and remote. See Alabama Power Co. v. Alabama Public Service Comm'n, 103 So. 2d 14, 17 (Ala. 1958) ("One of the fundamental rules of damages is that to be compensable they must be direct and reasonably certain, not remote and speculative").

Finally, it must also be pointed out that plaintiff's calculation of these alleged future lost profits is itself improper.  In its calculations, plaintiff has simply taken its actual damages from the first lease period, and extrapolated them forward five years, then reduced them to present value.  In performing the extrapolation, however, plaintiff's expert failed to take into account plaintiff's duty and ability to mitigate its damages with respect to a second five year lease.  Because if plaintiff could mitigate its damages by leasing any other trucks, as it did in 2017 with the Freightliners, plaintiff's current damage calculation of future lost profits represents an impermissible windfall.

## III.   **CONCLUSION**

For the reasons stated, Volvo's Motion for Partial Summary judgment is due

to be granted.

*s/ John C. Morrow*
John C. Morrow (ASB-9424-O77J)
Matthew D. Centeno (ASB-9270-X18M)
Attorneys for Defendant Volvo Group North
America, LLC d/b/a Volvo Trucks North
America

BURR & FORMAN, LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
jmorrow@burr.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing document by
Notice of Electronic Filing, or, if the party served does not participate in Notice of
Electronic Filing, by U.S. First Class Mail, hand delivery, fax or email on this the
7th day of November 2018:

Richard H. Gill (ASB-7945-G70R)            Jonathan H. Waller (ASB-0725-L53J)
Copeland, Franco, Screws & Gill, PA        Waller Law Office, PC
P.O. Box 347                               2001 Park Place, Suite 900
Montgomery, AL 36101-0347                  Birmingham, AL 35203
Tel.: (334) 834-1180                       Tel.: (205) 313-7330
gill@copelandfranco.com                    jwaller@waller-law.com

*s/ John C. Morrow*
OF COUNSEL
