IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

KNIGHT & SON TRANSPORTATION,   )
INC.,   )
  )
    Plaintiff,   )
  )
v.   )   CIV. ACT. NO. 1:17-cv-6-ECM
  )         [WO]
VOLVO GROUP NORTH AMERICA,   )
LLC d/b/a/ VOLVO TRUCKS NORTH   )
AMERICA,   )
  )
    Defendant.   )

**MEMORANDUM OPINION and ORDER**

Now pending before the Court are three motions filed by Defendant Volvo Group North America, LLC ("Volvo"): a motion for partial summary judgment filed on August 13, 2018, (doc. 28); a motion to exclude Robert Gould's expert report and opinions filed on August 13, 2018, (doc. 30); and a motion for oral argument filed on November 21, 2018, (doc. 50).[1]

The Plaintiff, Knight & Son Transportation, Inc. ("Knight & Son"), filed the complaint in this case on January 5, 2017, bringing claims for breach of express warranty (count one), fraud (count two), and suppression and conceit (count three).

The motion for partial summary judgment is directed to the fraud and suppression claims, and not to the breach of warranty claim. The Defendant also moves for summary judgment as to certain aspects of the Plaintiff's claims for lost profits.

---

[1] The Court will refer to the page numbers generated by CM/ECF.

Upon consideration of the briefs, evidence, and applicable law, and for the reasons that follow, the motion to exclude and for oral argument[2] are due to be DENIED, and the motion for summary judgment is due to be DENIED in part and GRANTED in part.

## I. JURISDICTION

The parties are diverse, and the amount in controversy exceeds $75,000, exclusive of interest and costs. (Doc. 1).  Therefore, the Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332.

Personal jurisdiction and venue are uncontested.

## II. LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "[A] court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

---

[2] The Court finds that the motions have been adequately briefed, and there is no need for oral argument.

2

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id.* at 1311–12.

### III. FACTS

The facts, taken in a light most favorable to the non-movant, are as follows:

Jeff Knight and Paul Knight are principals of Knight & Son—Jeff is Paul's son. They leased three Volvo trucks for their trucking business in July 2012 and three more in December 2012.

Before 2012, Knight & Son had used trucks with engines manufactured before 2010. In 2007 and 2010, the Environmental Protection Agency ("EPA") adopted new nitrogen oxide and particulate matter emission standards that became effective on January 1, 2010. These regulations significantly reduced the amount of particulate, soot, or oxides of nitrogen that could be released in the air. (Doc. 28 at 19). To meet these standards, Volvo added a technology to its US10 trucks called selective catalytic reduction ("SCR"), which would convert the exhaust gasses into non-pollutant discharge.

Knight & Son could use trucks manufactured before 2010 that were still compliant with the new regulations. But the company instead decided to acquire new trucks that

would have greater reliability, lower costs, and better fuel economy, so the trucks could stay on the road longer at less cost. (Doc. 42-8 at 3).

Before leasing the new Volvo trucks, Jeff and Paul Knight discussed the decision extensively with Jeff Thomley—a truck salesman with Action Truck Center ("Action"). (*Id*. at 2). Action had a Dealer Agreement with Volvo that explained Action was an independent contractor, not an agent, and had no authority to bind Volvo. (Doc. 29-2 at 19). The agreement also required that Action's sales personnel meet certain training requirements set by Volvo. (*Id*. at 81). Volvo certified Thomley as a certified Volvo salesman. As a part of his certification, Thomley attended a three-day sales summit every year at the Volvo plant where he received training and printed materials on what he "needed to know about the system." (Doc. 42-5 at 3). To maintain his certification, Thomley was required every year to complete online training and take six tests on the Volvo website. (*Id*.). Thomley agreed that he was the "conduit of information" from Volvo to the Knights. (*Id.* at 26).

Thomley pitched the Volvo trucks to the Knights in June, July, and December of 2012. (*Id.* at 11–12). Thomley told them Volvo had been using 2010 regulation EPA compliant engines and emissions systems in trucks in Europe for five years. (Doc 42-8 at 4). And because of this history, Volvo was ahead of its competitors in the United States on emissions standards. (*Id.*). In line with his sales training, Thomley explained the benefits of Volvo's experience with EPA compliant trucks in Europe. (Doc. 42-5 at 8–9).

As a part of his sales pitch, Thomley provided Volvo sales brochures for Jeff Knight's review. During one of the sales meetings, Thomley discussed the contents of the

4

brochures with the Knights. Either in the brochures themselves or in an explanation of them, the Knights were told the Volvo trucks would have better fuel efficiency than "any other competitor" and "there was a "specific reference to 5% better efficiency." (Doc 42-8 at 6).

The Volvo brochure also explained the truck had a "no regen engine." (*Id*.). Trucks must periodically burn off accumulated particulate through a process called "regeneration" or "regen."  Usually regeneration requires parking a truck while the engine burns off the particulate.  This can be a time-consuming and costly process because it takes the truck off the road.  In Volvo's "no regen engine," regeneration would occur automatically while the truck was on the road, so under "normal driving conditions" there would be no need to park the car for regeneration.  (*Id*.).  This is called passive regeneration.  Either by Thomley or in the Volvo brochures, the Knights were told the "no regen engine" was an important reason to buy Volvo trucks with the US10 engine because they would not have to perform any meaningful active regeneration procedures, which means the trucks could spend more time on the road. (*Id.* at 7–8).  As he was taught at the Volvo summits of the benefits, Thomley told the Knights that the driver only needed to be sure that there was enough diesel exhaust fluid ("DEF") in the tank to control the nitrogen oxide emissions and there would be no need for active regeneration. (*Id.* at 8).  This was a major selling point to the Knights.

Instead of keeping their old trucks, which were grandfathered in under the 2010 EPA regulation, the Knights decided to lease six new Volvo trucks—three in July 2012 and another three in December 2012.  The Knights leased six Volvo trucks because of

Volvo's history and experience in Europe, the no regen engine, improved fuel economy, reliability, and low maintenance costs. (*Id*. at 10).

The truck performed satisfactorily until the spring of 2015.  In 2015, trucks began requiring active regenerations, and on several occasions, the trucks required towing to repair facilities to initiate active regenerations. (*Id.* at 7). Around the same time, the trucks required repairs because of repeated failures with the exhaust system. (*Id.* at 12). Because of severe operational and performance problems with the Volvo trucks, the Knights parked the trucks in December 2016.  In 2017, Knight & Son acquired Freightliner trucks. (*Id.* at 13).

## IV.  DISCUSSION

The Defendant moves for summary judgment on two components of the Plaintiff's claims.  The Court will first consider the motion for partial summary judgment on the fraud and suppression claims.  And the Court will then consider the motion on the Plaintiff's damages calculations.

### A.    Motion for Partial Summary Judgment

The Defendant moves for summary judgment on the Plaintiff's fraud and suppression claims.  The Defendant argues its motion should be granted for four main reasons.  First, Volvo argues that it made no misrepresentations of fact to the Knights. Next, Volvo argues it cannot be held responsible for representations made by Thomley because he was not Volvo's agent.  And if even Thomley could be considered Volvo's agent, Volvo argues that the alleged misrepresentations were either puffery or too general to support a claim.  Third, Volvo asserts it had no duty to disclose information to the

6

Knights.   Finally, Volvo argues that the fraud and suppression claims are barred by Alabama's statute of limitations.

The Plaintiff responds that there are genuine disputes to material fact as to whether the Defendant committed affirmative fraud by misrepresentation or fraud by suppression. The Plaintiff contends that Thomley was an agent of Volvo, and even if he had no actual authority, the Knights understood him to have the apparent authority to speak for Volvo. According to the Plaintiff, the statements made by Thomley were material, and there was an obligation to disclose information to the Plaintiff that was not fulfilled.   The Plaintiff also argues that its claims are not barred by the statute of limitations.

The Court will start with the preliminary issues: whether the statute of limitations has run and whether Thomley had authority—actual or apparent—to bind Volvo.   From there, the Court will next consider the nature of the statements made to the Knights and whether there was any obligation to disclose information to them.

### 1.   Statute of Limitations

Because the Plaintiff leased the six trucks in July and December 2012, and the trucks began experiencing emissions-related issues starting in May 2013, the Defendant argues that Ala. Code § 6–2–38's two-year statute of limitations for fraud and suppression has run.   The Plaintiff responds that it was not until early 2015 that the Plaintiff thought it was the victim of fraud.   Although there were issues related to carbon monoxide sensors in 2013 and 2014, the Plaintiff believed Action had corrected them through warranty repairs. (Doc. 42-8 at 12).   And the Plaintiff argues it only had regeneration problems after 2014. (*Id.* at

10).  It was not until the spring of 2015 when it became clear that after repeated repairs the underlying issue with the exhaust system could not be fixed. (*Id*. at 11–12).

In Alabama, a fraud claim accrues, and the statutory limitations period begins to run, once the plaintiff has discovered, or should have discovered, the fraud. *See* Ala. Code § 6–2–3; *McGowan v. Chrysler Corp.,* 631 So. 2d 842, 845 (Ala. 1993).  The question of whether a party discovered or should have discovered fraud is usually left to the jury unless "the *plaintiff actually* knew of facts that should have put the reasonable person on notice of the fraud." *Id*. (citing *Hicks v. Globe Life & Acc. Ins. Co.,* 584 So. 2d 458, 463 (Ala.1991) (emphasis in original)).

For example, in the auto sales context, the Supreme Court of Alabama has found knowledge of fraud claims do not arise merely from the fact that a car did not perform as expected or from the first appearance of mechanical problems. *Id.*  In *McGowan v. Chrysler Corp.,* the plaintiff thought he was buying a top of the line luxury car, and there was no disclosure that the entire line of cars was known for recurring problems. *Id*. The Supreme Court held, "[a]lthough [plaintiff] knew for more than two years before he filed his complaint that his car had problems, we cannot agree with the trial court that the knowledge of these problems would be sufficient to alert a reasonable person of the fraud complained of." *Id.*  Because reasonable people could disagree about when a person should have known that his experiencing car problems was indicative of recurring problems with the entire line of cars, it was a question of fact whether the plaintiff should have discovered the fraud earlier.  *Id.* at 846.

Here, although the trucks required warranty repairs as early as 2013, the Plaintiff alleges that it was only in 2015 with the significant deterioration of the trucks' performance that it realized that the representations about fuel economy, emission controls, and reliability were false. The fact there are records of repairs, (doc. 28 at 52–55), made in 2013–2014 did not, as a matter of law, put the Plaintiff on notice of fraud because the Plaintiff alleges it believed that the Volvo was making effective warranty repairs at that time. (Doc. 48 at 37).[3]  It was only in 2015 that the Knights realized that Volvo, after failing repeatedly to repair the same components of the emissions system, was unable to make effective warranty repairs. (Doc. 42-8 at 11–12).  Additionally, in 2015–2016, the trucks began needing active regenerations, which sometimes could only be performed at repair facilities. (*Id.* at 7).  Like *McGowan,* even though some repairs were needed from 2013–2014, the allegation that repairs quickly escalated in 2015 creates a question of fact of when the Plaintiff knew or should have known of the alleged fraud. (*Id.* at 11–12).  Therefore, summary judgment is due to be DENIED on the statute of limitations ground.

---

[3] The Defendant also argues that the Plaintiff's receipt of written service invoices of repairs and the trucks' Operator Manual are written documents under Alabama's "bright-line" test for the accrual of fraud claims and thus the two statute of limitations started to run before January 5, 2015. (Doc. 28 at 49–56) (citing *Ex parte American General Finance, Inc.*, 795 So. 2d 685 (Ala. 2000) (found that loan documents put plaintiff on notice of allegedly fraudulent loan terms included in them).  Written documents received by the Knights and those received by the plaintiffs in the cases cited by the Defendant are distinguishable because in the cited cases the alleged fraud itself was contained and apparent in the financial documents themselves.  Here, the written documents simply documented the warranty repairs made to the trucks or, as in the case of the manual, provided mechanical instructions.  Therefore, they, in and of themselves, did not provide notice of the alleged fraud.

### 2.  Agency Relationship between Volvo and Thomley

Volvo argues Knight & Son cannot hold it responsible for statements made by Thomley because he was not Volvo's agent and, therefore, he had no authority to bind Volvo.  The Plaintiff responds that it has presented enough evidence to create a genuine dispute of material fact as to existence of an agency relationship between Volvo and Thomley.[4] And in the alternative the Plaintiff argues, if Thomley did not have actual authority, he had apparent authority to act for Volvo. Because both the Plaintiff and the Defendant advance theories based on actual and apparent authority, the Court will first determine if there is a genuine issue of material fact of Thomley having actual authority to bind Volvo, and if not, if Thomley had apparent authority to act on Volvo's behalf.

### a.  Actual Authority

An agency relationship, based on actual authority, exists when a principal has the right to control, whether exercised or not, the actions of the agent. *Glass v. S. Wrecker Sales*, 990 F. Supp. 1344, 1352 (M.D. Ala. 1998).  A principal has the right to control not just the result to be accomplished but also the way an action shall be done.  In other words, the principal may control not just what but actually *how* an activity is completed. *Id.* (emphasis added).  "Control must be proven; and proof of control requires more than proof of a mere right to determine if the person claimed to be an agent is conforming to the requirements of a contract." *Id.* (citing *Malmberg v. American Honda Motor Company,*

---

[4] The Court notes that there is no affirmative evidence of specific statements which Jeff Knight or Paul Knight relied on in the Volvo brochures.  In fact, Jeff Knight stated in his affidavit that he cannot recall what information was provided orally and what information was provided in brochures that Thomley showed to him. (Doc. 42-8 at 5).  The fraud claims, therefore, rest on an agency theory.

*Inc.*, 644 So. 2d 888 (Ala. 1994)).  In the car dealership-manufacturer context, the Supreme Court of Alabama distinguished between a manufacturer's right to inspect a dealership for compliance with a dealership agreement and day-to-day supervision of how the dealership might comply with the agreement. *Malmberg v. American Honda Motor Company, Inc.*, 644 So. 2d 888, 890 (Ala.1994).   Under Alabama law, the question of an agency relationship generally is determined by the trier of fact. *Glass*, 990 F. Supp. at 1351 (*see Cheatham v. General Motors Corp.*, 456 So. 2d 1101 (Ala. Civ. App. 1984)).  However, a plaintiff still must produce enough evidence to allow a reasonable fact finder to conclude that there is an agency relationship. *Id.* at 1351.

Even though Volvo trained Thomley, there is no evidence that Volvo controlled him or Action's day-to-day operations.  Although there is evidence of Thomley's extensive Volvo training, there is no evidence that Volvo provided day-to-day supervision of Action or directed Thomley on how exactly to perform the sales pitch. (Doc. 49 at 3–4).  Alabama courts have recognized that agency may not be presumed, and when a defendant makes a "prima facie showing that there was no agency relationship, the party asserting agency has the burden" of presenting evidence of the agency. *Malmberg*, 644 So. 2d at 890.  Although Plaintiff points to Thomley's Volvo training influencing his sales pitch and his use of Volvo brochures, this evidence is insufficient to show enough control for the existence of actual authority.  Therefore, the evidence presented is not sufficient to create a question of fact as to whether the Defendant retained the right to control and thus create an agency relationship between Volvo and Action and Thomley.

11

b.  Apparent Authority

Although the Plaintiff fails to present enough evidence of actual authority, the Plaintiff can still show Thomley had the apparent authority to act on Volvo's behalf.  Under Alabama law, "'apparent authority' is such authority as a principal knowingly permits an agent to assume or holds him out as possessing." *American Standard Credit, Inc. v. National Cement Co*., 643 F.2d 248, 267 (5th Cir.1981).[5]  The doctrine of apparent authority is based on the actions of the principal, not those of the agent. *Malmberg*, 644 So. 2d at 891.  Therefore, as "between the principal and third persons, mutual rights and liabilities are governed by the apparent scope of the agent's authority which the[ ] principal has held out the agent as possessing, or which he has permitted the agent to represent that he possesses and which the principal is estopped to deny.'" *Bain v. Colbert Cty. Nw. Alabama Health Care Auth.*, 233 So.3d 945, 956 (Ala. 2017) (citing *Malmberg*, 644 So. 2d at 891).  The Alabama Supreme Court has identified three factors for apparent authority: (1) that the principal acted in such a manner as to hold the agent out as its employee or agent or permitted the agent to hold himself out as its employee or agent; (2) that a third party had an objectively reasonable basis for believing that the agent was the principal's employee or agent; and (3) that the third party actually relied on the appearance that the agent was an agent or employee of the principal.  *Id.* at 957.

When determining if a dealership has the apparent authority to bind a manufacturer, the Supreme Court of Alabama has identified several characteristics of apparent authority.

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.

Manufacturer logos on signs, literature, products, brochures, and plaques at the dealership are important but insufficient, alone, to create an inference of an agency relationship. *Malmberg*, 644 So. 2d at 891; *John Deere Const. Co. v. England*, 883 So. 2d 173, 182 (Ala. 2003*)* (finding display of logos, signs, and literature, when the customer did not think he spoke to a John Deere representative, was insufficient to create an inference of an agency relationship).  Evidence of training has also been found to be significant to create an issue of material fact for Alabama apparent agency decisions. *See Anglin v. Household Retail Servs., Inc.*, 17 F. Supp. 2d 1251, 1257 (M.D. Ala. 1998).  The *Anglin* court noted that logo evidence *together* with evidence that a manufacturer provided warranties and instructed and trained its dealers on warranty eligibility, content, and availability were enough to create an inference of apparent authority. *Id.* (*citing Malmberg*, 644 So. 2d at 891).  Further in  *Goodyear Tire & Rubber Co. v. Washington*, 719 So. 2d 774, 777 (Ala. 1998), the court found it was a jury question of whether there was apparent authority because Goodyear intended customers to believe they were dealing with a Goodyear establishment by encouraging the dealer to use Goodyear signs, to sell Goodyear products, and represent that the dealership was a certified Goodyear auto service center.  In contrast, in *Glass*, there was insufficient evidence of apparent authority when there was no evidence that any logos or items with the purported principal's name on it were displayed, and there was no evidence of any training or instruction. *Glass,* 990 F. Supp. at 1353–54.

In this case, when viewed in a light most favorable to the non-movant, there are genuine issues of fact about whether the Defendant allowed Thomley to represent himself as an agent of Volvo, and intended the customers to believe they were dealing with Volvo.

Thomley completed online Volvo training, attended a three-day sales summit every March that included classes on things he "needed to know about the system," took six tests per year on Volvo's website, and used the "information that Volvo had provided" in "three-day summits" in his sale pitch to the Knights. (Doc. 42-5 at 3–4).  Jeff Knight also stated that he was provided Volvo brochures.  (Doc. 42-8 at 5)**.**  One brochure with Volvo's logo contained information about Volvo's "No Regen Engine" and stated that "To Find Out More, ask your Volvo Truck Dealer.  Your Volvo Truck Dealer is fully versed on SCR and can answer any questions you may have." (Doc. 29-18 at 9).  Timothy Suder, a Volvo engineer, agreed that the Defendant made representations to both "dealers and prospective purchasers" that "typical over-the-road operations should require passive regeneration in the normal course." (Doc. 42-7 at 8).  Further, Thomley described himself a "conduit of information, from Volvo to the Knights." (Doc. 42-5 at 26).  Therefore, a reasonable jury could find that Volvo held Thomley out as its agent.

A genuine issue of material fact also exists as to whether the Knights had an objectively reasonable basis for believing Thomley was an agent of Volvo and that the Knights relied on Thomley's appearance as a Volvo agent.  Paul Knight agreed that it was his understanding "that the promises were from Volvo, that Action was relaying information from Volvo." (Doc. 29-1 at 77).   Jeff Knight stated that the sales pitch Thomley gave him was the reason the Plaintiff bought the Defendant's trucks. (Doc. 42-8 at 11).  A reasonable jury could conclude that Volvo permitted Thomley to appear to have the authority to act on Volvo's behalf.  Thus, the Court concludes that the Defendant's motion for partial summary judgment on the issue of apparent authority is due to be denied.

### 3. Reasonable Reliance on Alleged Misrepresentations

The Defendant also argues that the Plaintiff cannot show that there is a genuine dispute of material fact that the Plaintiff reasonably relied on the representations made by Thomley because the identified representations were too general, a matter of opinion, or mere puffery to constitute fraud. The Defendant also contends that there is no evidence that any representations were false. The Plaintiff responds that the Defendant, through Thomley and brochures, made specific false representations upon which the Plaintiff relied.

In Alabama, "[t]he elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Exxon Mobil Corp. v. Ala. Dep't of Conservation & Nat. Res.*, 986 So. 2d 1093, 1114 (Ala. 2007). Reliance must be reasonable, and "if the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover." *Shutter Shop, Inc. v. Amersham Corp.,* 114 F. Supp. 2d 1218, 1227 (M.D. Ala. 2000) (citing *Torres v. State Farm Fire & Cas. Co.,* 438 So. 2d 757, 758–59 (Ala.1983)). The reasonableness of a plaintiff's reliance is a question of fact typically left for the jury. *Id*.

However, a court's main task is determining whether the defendant's statement is a misrepresentation of fact or simply an expression of opinion. *Shutter Shop, Inc.*, 114 F. Supp. 2d at 1227. Under Alabama law, a seller's statements must not be mere statements of opinion amounting to nothing more than sales talk or mere puffery or predictions of events to occur in the future. *McGowan,* 631 So. 2d at 846. The analysis turns "upon all

15

the circumstances of the particular case, such as the form and subject matter of the representation and the knowledge, intelligence and relation of the respective parties." *Harrell v. Dodson*, 398 So. 2d 272, 274–75 (Ala. 1981) (citations omitted). In close cases, the question should be left to the jury. *Thompson v. United Cos. Lending Corp.*, 699 So. 2d 169, 173 (Ala. Civ. App. 1997).

In drawing lines between opinion or puffery with statements of fact, courts have generally found the more specific the statement the more likely it is to be a fact. Courts have been reluctant to characterize "loose general statements made by sellers in commending their wares" as statements of material fact. *Shutter Shop, Inc.*, 114 F. Supp. 2d at 1229. For example, general claims about a product's performance without specific details or any empirically verifiable statements were not considered statements of material fact. *Id.* Further, "a seller's general claims that its product or service is 'better' than another—or even 'the best'—simply are not misrepresentations of material fact . . . [because] the seller is merely boasting or expressing a general opinion upon which, in itself, no buyer can reasonably rely." *Scott v. Dixie Homecrafters*, 125 F. Supp. 2d 1311, 1314 (M.D. Ala. 2000). For example, in *Cork v. Marriott Int'l, Inc.*, 426 F. Supp. 2d 1234, 1245–1246 (N.D. Ala. 2006), the court concluded a statement that a company was "the 'biggest and best' temporary housing company and that the industry was 'growing'" was akin to a statement that a house was the best house in the neighborhood and was mere opinion.

In car sales, describing a car as "top-of-the-line," "luxury," and "smooth-riding" has been held to be opinion or puffery. *McGowan v. Chrysler Corp.*, 631 So. 2d 842, 847 (Ala. 1993). Similarly, comparisons that a pump was "as good or better" than another pump

were also considered "traders' talk," or "puffery." *Lucky Mfg. Co. v. Activation, Inc.*, 406 So. 2d 900, 905 (Ala. 1981).  On the other hand, there was a jury question when a "car began consuming oil at an inordinate rate a month after the purchase . . . [and] the dealer who sold the car stated that it was a 'good' car that would get 'good' service  . . . and the dealer and Ford refused to repair the car." *Ford Motor Co. v. Phillips*, 551 So. 2d 992, 994 (Ala. 1989).

With these principles in mind, the Court will examine the five statements Plaintiff claims it relied on and which turned out to be false.  Ultimately, three out of the five statements raise a genuine issue of material fact.

a. Volvo's experience in Europe

In leasing the new Volvo trucks, the Knights argue they relied on Thomley's assurance that Volvo had five years' experience with US10 emissions systems, and therefore, the trucks would not have the same exhaust problems as their American competitors. (Doc. 42-8 at 4).  The Knights knew of the problems that American manufacturers were having with US10 emissions systems. (*Id.*).  The Knights were also given a CD about Volvo's experience and research outside the United States, which supported what Thomley had told them. (Doc. 29-1 at 52–53). The Defendant argues that these statements "are too generally to be actionable" and "are nothing more than statements of opinion and sales puffery." (Doc. 49 at 17).

A reasonable jury could find that the statements about Volvo's experience in Europe constituted fraudulent representations of material fact.  Although Thomley told the Knights that Volvo's five-year experience made its emissions systems more reliable, these

statements are more specific than general statements that a seller's product is good or better than its competitors. The statements about Volvo's European experience underpinned not just why Volvo was better than its competitors but also other statements about the reliability of the exhaust system in general. The Plaintiff produced evidence that the Volvo engines and exhaust system used in Europe were not interchangeable with the ones in the trucks bought by the Knights. (Doc. 48 at 3). Instead, the European engines were subject to different regulatory schemes—Europe allows "much higher levels of emissions"—, Volvo never tested major components of its American truck's exhaust systems in Europe, and the European trucks had significantly less technology than the trucks bought by the Knights. (*Id*. at 3, 9–10). With this evidence in mind, these statements were more than general statements of opinion or puffery—they were instead statements of fact that Volvo's experience in the United States came from its experience testing the same trucks in Europe, which the Plaintiff argues is false. The statement was material because the Knights identified it as one of the reasons they purchased the trucks. And a reasonable jury could find that the Plaintiff relied on statements from Thomley—a certified Volvo seller—about Volvo's experience in Europe. Therefore, the Court concludes that the evidence presented would allow a reasonable jury to conclude that the statements about the Defendant's five-year experience in Europe were statements of material fact upon which the Plaintiff reasonably relied, and therefore, summary judgment on this basis is due to be DENIED.

b. Representations about passive regeneration

The Knights also allege that they were told by Thomley and in unspecified brochures that Volvo trucks had a "No Regen Engine[s]." Specifically, they understood

this to mean that, under normal driving conditions, that there would be no need to park and perform an active regeneration on the Volvo trucks. (Doc. 42-8 at 7-8). The Defendant argues the statements about passive regeneration were puffery and were too vague for a claim of misrepresentation. Volvo also argues that there were no misrepresentations of fact regarding regeneration because under "normal driving conditions" there would be normally no need for active regeneration. (Doc. 49 at 15–16). Because the Plaintiff's idle times—the time the truck's engine is on but not moving—were higher than average, Volvo argues Knight & Son's operation of its trucks was outside "normal driving conditions" (*Id*.)

Like statements about Volvo's experience in Europe, Thomley's and the brochures' representations about no need for active generation under "normal driving conditions" are verifiable factual questions. Although Volvo argues that it did not state there would never be a need for active regeneration, Jeff Knight testified that he was told or saw in a brochure that there would be no need for active regeneration. In response to Volvo's allegation about idle times, the Plaintiff points to the testimony of an Action employee who stated that the Plaintiff's idle times were within Volvo's acceptable range. (Doc. 42-6 at 61). Because the parties dispute what the Knights were told and whether their trucks were within the specifications for passive regeneration, the Court concludes that there are questions of fact as to whether the representations made to the Plaintiff about the engine and its need for active regeneration were truthful statements. A jury question is presented as to reasonableness in relying on those statements. Summary judgment is due to be DENIED as to this aspect of the fraud claim.

c. Representation Regarding Warranty Repairs

Jeff Knight did not identify a specific representation about a warranty, but he points to Thomley's testimony that Thomley admitted to telling the Knights that they could depend on Volvo to honor its warranty obligations. (Doc. 42-5 at 11). The Plaintiff alleges that it understood "Volvo would make warranty repairs in a timely and effective way." (Doc. 48 at 25).  Specifically, the Plaintiff alleges:  "Volvo also knew and intended that innocent representations by the Action sales department and service department that Volvo would properly perform warranty repairs were false," and that Volvo "intended to mislead and deceive Plaintiff Knight in making these misrepresentations." (Doc. 1 at 11).  The Defendant responds that such statements were not just puffery but were opinions of future performance that Thomley stated with no intent to defraud, so the statements were not fraudulent.

When an alleged misrepresentation relates to a future event, a plaintiff must not only prove the usual elements of fraud but must also prove that at the time the statement or promise about the future was made, there was actual fraudulent intent not to perform the act promised as well as intent to deceive plaintiff. *D.H. Holmes Dep't Store v. Feil*, 472 So. 2d 1001, 1003 (Ala. 1985).

The fact the Plaintiff cannot identify a specific representation of the warranty guarantees suggests that the statement was too general to constitute a factual statement. Further, the Plaintiff does not list the warranty statement as one of the reasons he purchased the Volvo trucks.  Because there is insufficient evidence from which a reasonable jury could find that the Plaintiff relied on representations about the warranty, the Court

20

concludes that summary judgment is due to be GRANTED as to this aspect of the fraud claim.

### d. Representation that Volvo Trucks Would Have Low Maintenance

The Knights argue that they was told "Volvo Trucks would have low maintenance," and they relied on information about "lower maintenance costs" in purchasing the trucks. (Docs. 48 at 25; 42-8 at 10).[6]

A reference to "low maintenance" is too general and is more like an expression of opinion, which cannot support a fraud claim. *See Russell*, 991 So. 2d at 747–748. The Plaintiff has not pointed the Court to any evidence that the specific representation was false or that the Defendant had no intent to perform the act promised or intended to deceive the Plaintiff. The Court concludes, therefore, that summary judgment is due to be GRANTED as to the maintenance cost aspect of the fraud claim.

### e. Representation Regarding Fuel Economy

The Plaintiff identifies two allegedly false representations about the truck's fuel economy: the Volvo engine would deliver 5% better efficiency than all other trucks, and the Volvo engine delivers "the best fuel economy of any 13-liter coach engine out there." (Doc. 48 at 17–18). Jeff Knight stated that Thomley told him that the Volvo D13 truck would have better fuel efficiency than any competitor and that in his best judgment, the representation was that it would have 5% better efficiency. (Doc. 42-8 at 6). Jeff Knight

---

[6] Although Thomley testified that the emissions filter system only needs to be furnished every 200,000 miles, the Plaintiff did not reference this specific statement as a representation he relied on in the lease of the trucks, so it will not be considered by the Court.

noted he could not remember specifically what information was conveyed in brochures and what information was conveyed orally. (Doc. 42-8 at 4).

The Defendant takes issue with both aspects of the representation regarding fuel efficiency.[7]  The Defendant argues that the Plaintiff cannot show that the statement about the engine being 5% more efficient than any other engine was nothing more than sales puffery.  It also argues Volvo does not publish expected miles per gallon figures, so the brochure's claim is not sufficiently specific to support a fraud claim related to the performance of Plaintiff's specific trucks.  The Defendant asserts that the claim about 5% better efficiency was in comparison to other Volvo trucks—*not competitors' trucks*. Finally, the Defendant argues, the brochure says that this efficiency is under normal conditions.

Although 5% better fuel efficiency is a comparison, it is specific enough and verifiable that it is not necessarily an opinion or sales puffery.  Although the Defendant says the Plaintiff could not rely on its brochures, Jeff Knight explains he relied on oral representations that the Defendant's engine was 5% better than all other trucks.  The Court concludes that the Plaintiff's reliance was not unreasonable as a matter of law.  *Cf. AmerUs Life Ins. Co.*, 5 So.3d at 1208.

---

[7] Regarding the 13-liter "coach engine," the Defendant states that a "coach" is a bus, the brochure in evidence is for buses and includes pictures of buses. (Doc. 29-15).  Therefore, it is irrelevant and could not have been reasonably relied on by the Plaintiff.  The statement in the brochure regarding efficiency of a "coach engine," does not support a fraud claim without some evidence that it was relied upon by the Plaintiff, or that such reliance on a representation regarding buses would have been reasonable in this circumstance. The Court concludes, therefore, that summary judgment is due to be GRANTED to the extent that the Plaintiff seeks to rely on a representation by the Defendant in a brochure that its engine was the most efficient "coach engine."

Therefore, there is a genuine dispute of material of fact with respect to the 5% efficiency representation sufficient to preclude summary judgment as to that aspect of the Plaintiff's claim. Therefore, the motion for summary judgment related to the on the fuel economy representations is DENIED.

### 4. Reasonable Reliance on Suppressed Facts

The Defendant also argues that the Plaintiff cannot demonstrate reasonable reliance on any facts allegedly suppressed by the Defendant.  In the complaint, the Plaintiff identified multiple suppressed facts, (doc. 1 at 12), but in its response to the motion for summary judgment, the Plaintiff focuses on only one representation: that the Defendant was not forthcoming about the exhaust system, specifically under what circumstances active regeneration would be needed. (Doc. 48 at 7–8 and 35).[8]  The Defendant argues the Plaintiff could not have reasonably relied on any representation related to the exhaust system.  It also argues that it had no duty to disclose additional facts.

To succeed on a fraudulent suppression claim, a plaintiff claim must demonstrate: (1) that the defendant had a duty to disclose material facts; (2) that the defendant concealed or failed to disclose those facts; (3) that the concealment or failure to disclose induced the plaintiff to act or to refrain from acting; and (4) that the defendant's action resulted in harm to the plaintiff. *Bethel v. Thorn*, 757 So. 2d 1154, 1162 (Ala.1999).  A duty to disclose may be created either by a "confidential relations[hip]" between the parties, or from the

---

[8] The issue of duty has not been adequately addressed by the Plaintiff as to any other suppressed fact.  The Court, therefore, cannot conclude that there was a duty as a matter of law. *See Barnett v. Funding Plus of America, Inc*., 740 So. 2d 1069, 1074 n.7 (Ala.1999).

"particular circumstances of the case." Ala. Code §6–5–102.   The Supreme Court of Alabama has explained that once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated.  *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So. 2d 883, 895 (Ala. 2005).   Under Alabama law, whether there is a duty to disclose is a question of law. *Barnett v. Funding Plus of America, Inc.*, 740 So. 2d 1069, 1074 (Ala.1999).

In opposing summary judgment, the Plaintiff argues that this case falls within two exceptions to the general rule regarding arm's length transactions; namely, where the information is requested by a party and where a party opts to disclose some, but not all of the information. *Freightliner, L.L.C.*, 932 So. 2d at 892 & 895.  Through Volvo brochures and representations made by Thomley, representations were made to the Plaintiff that the Volvo "no regen engine" was the solution to avoid active regeneration.   One brochure specifically stated the "new system is the only one that meets the EPA's near-zero NOx emissions requirement while at the same time relieving the driver of ever having to worry about active regeneration in normal highway operations." (Doc. 29-18 at 4).  Jeff Knight stated that Thomley also told him that the driver only needed to ensure that there was enough DEF fluid in the tank to avoid active regeneration. (Doc. 42-8 at 8).  Although it is unclear what brochures the Plaintiff examined, even accepting that one brochure referred to "normal highway operations," there was no disclosure that idle times would require active regeneration.   Jeff Knight stated neither Thomley nor Volvo's written materials explained that any percentage of idle time was excessive, was outside of the Defendant's operating guidelines, or would cause active regeneration. (*Id.* at 14).   And, as earlier

discussed, the Plaintiff has presented evidence that its idle times fell within a range of normal operations. (Doc. 42-6 at 61). The Plaintiff also claims that it was injured because the Defendant did not disclose the circumstances under which active regeneration was required. The Court concludes that there are genuine disputes of material fact as to the Plaintiff's actions in relying on, or being induced by, suppressed facts. Accordingly, the Court concludes that a reasonable jury could conclude that the Defendant had a duty to disclose, and that summary judgment is due to be DENIED to the extent that the suppression claim is based on a failure to disclose, that while no active regeneration was required under normal over-the-road or driving conditions, those normal conditions did not include idle time.

### 5. *Reasonable Reliance in the Purchase of the Final Three Trucks*

The Defendant argues that the Plaintiff cannot hold Volvo liable for representations made about the second group of three trucks leased in December 2012 because the Plaintiff chose to lease them based on the performance of the first three—not representations by the Defendant. The Plaintiff does state that the performance of the first three trucks resulted "in Knight acquiring three more Volvo Trucks in December 2012." (Doc. 48 at 7). The Plaintiff contends that whether reliance is reasonable in a particular case is a question of fact for the jury. Jeff Knight testified that he "relied on the information orally communicated by Mr. Thomley and as set forth in these brochures in making the decision to acquire the six Volvo trucks at issues [sic]." (Doc. 42-8 at 10). Thomley also agreed in his deposition that he made representations to Jeff and Paul Knight in "June, July of 2012 and December of 2012 when in each time period they bought three trucks." (Doc. 42-5

at 8).  This Court concludes, therefore, that there are genuine disputes of material fact about whether that the Plaintiff relied on the representations made, and whether that reliance was the reasonable.

## B.  Motion to Exclude Expert Testimony and Summary Judgement on Lost Profits Calculation

### 1.  Motion to Exclude

The Defendant seeks to exclude opinions and the report of the Plaintiff's expert Robert Gould.  The Defendant does not object to Gould's qualifications. (Doc. 40 at 2, n.1).  Instead, Volvo argues that Gould's calculation of the Plaintiff's lost profits is flawed because it is based on an assumed gross revenue figure that is without factual basis.  The Defendant argues the gross revenue goal simply reflects what the market will bear and is not related to the performance of the Volvo trucks.  The Defendant does not take issue with whether Gould's approach is valid. (*Id.* at 2).  Instead, the Defendant argues that "garbage in yields garbage out." (*Id.* at 3).  The Plaintiff responds there is no disagreement as to the propriety of Gould's methodology, but instead it is merely a factual dispute as to the calculations, which goes to the weight of the expert evidence and not its admissibility.  The Plaintiff points out that the Defendant's expert also stated that Gould uses a method that the Defendant also used, but just applied different facts. (Doc. 39-4 at 11).

Under Rule 702, to qualify as an expert, a witness is required to possess the "knowledge, skill, experience, training or education" relevant to the evidence at issue. Fed. R. Evid. 702.  In determining reliability under Rule 702, a court may ask: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to

26

peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). (citing *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 593–594 (1993)).

The Eleventh Circuit explained that once a method is deemed reliable, the evidence is admissible, and the "identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 325 F.3d 1313, 1345 (11th Cir. 2003). Distinguishing between the reliability of a method used and the application of that method, the Eleventh Circuit has found "garbage in, garbage out" is not a sufficient reason to exclude evidence. *Id.* at 1344–1345. Criticism of numbers used in a calculation "impugn the accuracy of his results, not the general scientific validity of his methods." *Id.* at 1345.

In this case, it is undisputed that Gould used a reliable method of calculating lost profits. The Defendant's criticism of Gould's methodology goes to its weight, and not its admissibility. *See Id.* This Court, therefore, concludes that the Motion to Exclude is due to be DENIED as to Gould's calculations of lost profits.

### 2. *Summary Judgment on Plaintiff's damages claim*

The Defendant also moves for summary judgment on the Plaintiff's claim for lost profits in 2017 and its lost profit damages for the years 2018 to 2022. Specifically, for 2017, the Defendant argues that the Plaintiff had stopped using Volvo trucks in 2017 and replaced them with 6 Freightliner trucks. And for 2018–2022, the Plaintiff's lease would have ended. The Defendant also argues that the Plaintiff cannot seek damages for

subsequent years for any revenue shortfall from the Freightliners because the Plaintiff had a duty to mitigate damages and the failure of Freightliners trucks to meet a gross revenue target is not a mitigation cost. The Plaintiff responds that it attempted to mitigate damages. Jeff Knight states that the purpose of acquiring the Freightliner trucks was "to replace, and attempt to replace, at least in part, the lost revenues Knight suffered as a result of the deficient performance of the Volvo trucks." (Doc. 42-8 at 13). And whether a plaintiff has adequately mitigated damages is a question jury—not for summary judgment.

In Alabama, "the rule is that in the event of the destruction or interruption of an established business, loss of profits may be recovered if the amount of actual loss is rendered reasonably certain by competent proof." *Birmingham News Co. v. Horn*, 901 So. 2d 27, 65 (Ala. 2004) (citation omitted). "Lost profits are recoverable if they are proved with reasonable certainty." *Id.* Even "anticipated profits of an unestablished business may be recovered if such damages are proved with 'reasonable certainty." *Id.* Additionally, in Alabama, "one injured by fraudulent representation is entitled to recover all damages which were in the contemplation of the parties or which were either necessary or natural and proximate consequences of the fraud." *P & S Bus. Machines, Inc. v. Olympia U.S.A., Inc.*, 707 F.2d 1321, 1323 (11th Cir. 1983). "A plaintiff can recover only damages that would have been sustained if the plaintiff had exercised such care as a reasonably prudent person would have exercised under like circumstances to mitigate the damage or loss." *Avco Fin. Servs., Inc. v. Ramsey*, 631 So. 2d 940, 942 (Ala. 1994). Whether the plaintiff has sufficiently mitigated damages generally is a question of fact. *Id.*

The Plaintiff seeks to recover damages for profits lost during the year 2017, while it still had the lease for Volvo trucks but was no longer using them.  The Plaintiff did not merely stop using the six Volvo trucks in 2017 and then claim the entire year of lost revenue as damages.  Instead, the Plaintiff leased Freightliner trucks, and now seeks the profits, it would have gotten in the absence of the Defendant's actions.  The Court concludes that whether the amount of profits lost in 2017 has been accurately calculated is a genuine dispute of material fact.  Therefore, summary judgment is due to be DENIED.

Similarly, for the lost profits in the years 2018–2022, the Defendant argues that the Plaintiff cannot recover damages because the Plaintiff did not lease any Volvo trucks during those years—the leases of all the Volvo trucks expired at the end of 2017.  And even though there may have been a plan to lease Volvo trucks for an additional period, there was no obligation to do so, and therefore, it would be too speculative to allow for an award of damages.  The Defendant argues the American Institute of Certified Public Accountants supports not including damages that would extend the contract term when calculating lost profits from a breach of contract.  The Plaintiff responds that this is not consistent with Alabama damages law, which allows for a plaintiff to recover for lost future profits as a measure of compensatory damages if they are reasonably certain.  The Plaintiff presents evidence that it had a business plan to replace the Volvo trucks under the successor five-year lease. (Doc. 39-1 at 14).[9] The Plaintiff also point to Richard Bell's testimony that

---

[9]  While this statement is within Gould's affidavit and Richard Bell's deposition, the Court has considered it because it is a statement which may be reduced to admissible form at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (stating, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.").

it is a regular business practice in the trucking industry to purchase or lease trucks for three to five years and then replace the trucks with new trucks from the same manufacturer. (Doc. 39-4 at 19).

The Supreme Court of Alabama has considered not just the term of the contract but also the potential extension of the term in calculating damages. *Kirkland & Co. of Anniston, P.C. v. A & M Food Serv., Inc.*, 579 So. 2d 1278, 1287 (Ala. 1991). In that case, the court examined whether the "reasonable certainty" standard for lost profits extended beyond 4 years remaining in a lease when "the lessee had the opportunity to extend the lease for two 5–year terms." *Id.* The court concluded it did and calculated lost profits based on both the four years remaining and the 10-year possible extension. *Id.* Consequentially, the Court concludes that the evidence to support that the future lease terms, including evidence that the extension was anticipated and expected in the industry, is sufficiently certain so that the damages claim is not precluded as a matter of law.[10]

## V. CONCLUSION

For the reasons discussed, it is hereby ORDERED as follows:

1.  The motion to exclude Robert Gould's expert report and opinions, (doc. 30), and the motion for hearing, (doc. 50), are DENIED.

2.  The motion for partial summary judgment filed by Defendant Volvo Group North America, LLC, (doc. 28), is GRANTED as to, and judgment is entered in

---

[10] The motion to exclude also is due to be DENIED as to these aspects of Gould's testimony and report.

favor of the Defendant and against the Plaintiff on, the fraud and suppression claims based on any representation regarding warranties as forming part of the decision to purchase Volvo trucks, any representation as to the maintenance cost of the trucks, and any representation by the Defendant in a brochure that its engine was more efficient than any "coach engine."

3. The motion for partial summary judgment is DENIED as to all other aspects of the fraud claim, the claim that facts regarding the need for active regeneration were suppressed, and the Plaintiff's claims for lost profits.

Done this 29th day of March, 2021.

/s/   Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE